MINERVA DE PAZ LISK, apelada, *v.* HON. AWILDA APONTE ROQUE, ETC., apelantes.

*Número:* CE-86-710 *Resuelto:* 30 de junio de 1989

*Rafael Ortiz Carrión, Procurador General,* y *Anabelle Rodrí-guez, Procuradora General Auxiliar,* abogados de los apelantes; *Luis H. Sánchez Caso,* abogado de la apelada.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

Mediante apelación el Procurador General de Puerto Rico cuestiona la decisión del Tribunal Superior que declara inconstitucional el requisito de ciudadanía que deben reunir los candidatos a certificados de maestro dispuesto por el Art. 5 de la Ley Núm. 94 de 21 de junio de 1955 (18 L.P.R.A. sec. 264(1)). El Estado también invoca su inmunidad por los actos u omisiones de sus funcionarios y apela la imposición de daños a los demandados en su carácter personal porque están protegidos por la doctrina de inmunidad cualificada. Procede la modificación de la sentencia apelada únicamente en cuanto a la determinación de daños.

I

La demandante Minerva De Paz Lisk es ciudadana de la República Dominicana y residente legal en el Estado Libre Asociado de Puerto Rico desde 1978, en virtud de visado permanente expedido por el Servicio de Inmigración y Naturalización de Estados Unidos de América. En 1981 completó en Puerto Rico sus estudios universitarios y obtuvo el grado de bachiller en artes con concentración en español y educación secundaria.

El mismo año de su graduación la demandante acudió al Departamento de Instrucción Pública (D.I.P.) para solicitar un certificado de maestra, a tenor con la Ley Núm. 94 de 21 de junio de 1955, según enmendada, 18 L.P.R.A. sec. 260 *et seq.* (en adelante Ley Núm. 94), estatuto que en aquel momento regulaba la certificación de maestros, tanto en el sistema de instrucción pública como en las escuelas privadas acreditadas por dicho Departamento.

La solicitud no prosperó. De Paz Lisk incumplía con el primero de los requisitos exigidos a todo candidato, es decir, ser ciudadano de Estados Unidos de América. Decidió proseguir estudios conducentes al grado de maestría en arte en la Escuela Graduada de la Facultad de Humanidades de la Universidad de Puerto Rico. A la fecha de la presentación del recurso, había aprobado todos los cursos requeridos; le faltaba un examen y la tesis.

En agosto de 1985 De Paz Lisk solicitó nuevamente el certificado, pero el documento no fue expedido por no presentar evidencia de la ciudadanía americana. En esta ocasión la Directora de la División de Certificaciones Docentes entregó a la demandante una carta acreditativa de que ésta reunía los requisitos de preparación académica para la obtención de un certificado provisional como maestra de escuela elemental y secundaria en español.

Ante esta situación la apelada entabló una demanda de daños y perjuicios, *injunction* y sentencia declaratoria contra la Secretaria del Departamento de Instrucción Pública y otros funcionarios en su carácter personal y representativo. Alegó que el requisito de ciudadanía dispuesto por la Ley Núm. 94, *supra*, como condición indispensable para la obtención del certificado en cuestión, constituía un discrimen por razón de extranjería en violación de las cláusulas del debido proceso de ley y de la igual protección de las leyes de la Constitución federal, y del Art. II, Secs. 1 y 7 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. Invocó asimismo la Sec. 16 del mismo Art. II de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, dispositiva del derecho que tiene todo trabajador a escoger libremente su ocupación, y alegó que la conducta impugnada resultaba en una violación a la Ley Federal de Derechos Civiles, 42 U.S.C. sec. 1983, y a la Ley de Derechos Civiles de Puerto Rico. 32 L.P.R.A. sec. 3524. Por último, adujo que el Estado Libre Asociado no podía reclamar válidamente la ciudadanía como

condición al magisterio por ser éste un poder reservado al Gobierno federal en las áreas de inmigración y naturalización. Art. I, Sec. 8, Cl. 4 y Art. VI, Cl. 2, Const. EE.UU., L.P.R.A., Tomo 1.

El 24 de julio de 1986 el Tribunal Superior, Sala de San Juan, declaró inconstitucional el inciso primero del Art. 5 de la Ley Núm. 94, *supra*, y ordenó a los demandados que otorgaran a De Paz Lisk en el plazo de quince (15) días el certificado de maestra de conformidad con la ley y con los reglamentos aplicables, además de la suma de $10,000 por concepto de daños personales.

Luego de varios incidentes postsentencia, el 28 de octubre de 1986 el D.I.P. expidió a la demandante un certificado provisional de maestra, al tiempo que sometió escrito de apelación ante este Foro. Oportunamente acogimos el recurso y, luego de agotado el trámite reglamentario, estamos en posición de resolver.

## II.

No cabe duda de que el Congreso federal cuenta con plenos poderes para aprobar leyes relativas a la inmigración hacia Estados Unidos. En tal capacidad el Congreso decide quién puede entrar y permanecer en territorio norteamericano, así como el *status* legal de las personas admitidas. Las fuentes de dicho poder emanan de varias disposiciones de la Constitución de Estados Unidos, entre otras, del Art. I, Sec. 8, Cl. 3 (poder sobre el comercio); Art. I, Sec. 8, Cl. 4 (poder de naturalización); Art. I, Sec. 8, Cl. 11 (poder para declarar la guerra); Art. I, Sec. 9, Cl. 1 (poder sobre la inmigración y la importación). Véase Legomsky, *Immigration Law and the Principle of Plenary Congressional Power*, 1984 Sup. Ct. Rev. 255, 261–269.

Históricamente, sin embargo, tanto los estados como Puerto Rico han legislado en el área del empleo público y

distinguido entre ciudadanos y extranjeros. Bajo la situación de hechos allí presente, en *Truax v. Raich*, 239 U.S. 33, 42 (1915), y en *Takahashi v. Fish Comm'n*, 334 U.S. 410, 419 (1948), el Tribunal Supremo utilizó el análisis de campo ocupado para invalidar legislación estatal que brindaba trato preferente a los ciudadanos en el mercado de empleo. El Tribunal razonó que ello equivalía de facto a una denegación de la residencia, situación reñida con la política inmigratoria sólo encomendada al Congreso federal.

No obstante estas expresiones, notablemente matizadas por jurisprudencia posterior, el Tribunal Supremo federal aún no ha elaborado una doctrina coherente al respecto. En ocasiones ha utilizado el argumento de campo ocupado como alternativa al análisis de igual protección de las leyes. Véanse: *Nyquist v. Mauclet*, 432 U.S. 1, 12 (1977); *Examining Bd. v. Flores de Otero*, 426 U.S. 572, 602 (1976). En *Graham v. Richardson*, 403 U.S. 365, 376, 380 (1971), el Tribunal utilizó ámbas doctrinas para invalidar la legislación allí en controversia. En otras ocasiones ha declinado expresamente abordar el planteamiento. *Sugarman v. Dougall*, 413 U.S. 634, 646 (1973).

En su última trayectoria dicho Foro ha permitido libertad de acción a los estados para reglamentar el ingreso de extranjeros a ciertas posiciones públicas. *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982); *Ambach v. Norwick*, 441 U.S. 68 (1979); Nota, *The Equal Treatment of Aliens: Preemption or Equal Protection?*, 31 Stan. L. Rev. 1069, 1081 (1979); Caso Reciente, *State Alienage Classifications: Time for Federal Preemption?*, 28 (Núm. 2) Loy. L. Rev. 632 (1982); Nota, *State Burdens on Resident Aliens: A New Preemption Analysis*, 89 Yale L.J. 940 (1980). También ha rechazado sin rodeos el argumento de que toda legislación estatal que de alguna forma incida sobre la política inmigratoria está desplazada por la cláusula de supremacía federal, Art. VI, Cl. 2 de la Constitución de Estados Unidos, *supra. De Canas*

*v. Bica,* 424 U.S. 351, 355–356 (1976).(¹) Con este trasfondo doctrinal la apelada no puede afirmar que la legislación en controversia pretende regular la inmigración o la condición legal de los extranjeros en Puerto Rico. Ciertamente no la prohíbe; tampoco la selecciona o limita. No le asiste la razón a la apelada en este planteamiento.

### III

La Constitución de Estados Unidos, en su Enmienda Decimocuarta, Sección Primera, establece en lo pertinente que "ningún estado privará a persona alguna de su vida, de su libertad o de su propiedad, sin el debido proce[so] de ley, ni se negará a nadie, dentro de su jurisdicción, la igual protección de las leyes". Const. EE. UU., L.P.R.A., Tomo 1, ed. 1982, pág. 196.

Hace ciento dos (102) años el Tribunal Supremo federal resolvió que los extranjeros son "personas" para propósitos de esta enmienda y, por lo tanto, acreedores a la igual protección de las leyes. *Yick Wo v. Hopkins,* 118 U.S. 356 (1886).

Partiendo de esta noción básica, la jurisprudencia de dicho Foro ha seguido a través de los años un curso fluctuante.(²) En *Graham v. Richardson,* supra, el Tribunal resolvió que la cláusula de igual protección de las leyes prohíbe a los estados negar a un extranjero los beneficios públicos de índole económica por razón de no ser ciudadano o residente del país. La otra categoría sobre la que no existe polémica tiene que ver con el acceso de los extranjeros a la práctica de una profesión o actividad económica privada. En estas situa-

---

(¹) Para efectos del análisis de campo ocupado, Puerto Rico está en la misma situación de los estados. *P.R. Consumer Affairs Dept. v. Isla Petrol.,* 485 U.S. 495 (1988).

(²) El mismo Tribunal Supremo federal lo admite en *Ambach v. Norwick,* 441 U.S. 68 (1979). Véase, también, *Cabell v. Chavez-Salido,* 454 U.S. 432 (1982).

ciones, toda clasificación se entiende igualmente sospechosa y solamente supera el análisis de estricto escrutinio constitucional si promueve un interés gubernamental apremiante o de primer orden. *Examining Bd. v. Flores de Otero*, supra (Puerto Rico no puede negar a un extranjero una licencia para la práctica privada de la ingeniería); *In re Griffiths*, 413 U.S. 717 (1973) (tampoco puede condicionarse sobre este fundamento la admisión a la abogacía); *Bernal v. Fainter*, 467 U.S. 216 (1984) (ídem en relación con la práctica de la notaría).

■ No obstante, en 1973 el Tribunal Supremo creó una limitada excepción al análisis de estricta revisión judicial formulado en *Graham v. Richardson*, supra. Específicamente se sostuvo que en determinadas circunstancias rigurosamente definidas los estados pueden impedir que los extranjeros ocupen posiciones en el Gobierno. *Sugarman v. Dougall*, supra. Si bien se reafirmó la norma de acucioso examen constitucional en el caso de legislación que impide la participación de los extranjeros en la distribución de beneficios económicos, el Tribunal reconoció que los estados tienen un interés legítimo en preservar para los ciudadanos ciertas posiciones públicas relacionadas íntimamente con el proceso de autogobierno o que conllevan el ejercicio de poderes importantes en la comunidad. Clasificaciones que distinguen entre ciudadanos y extranjeros en esta área de funciones públicas que el Tribunal denominó "políticas" en el significado amplio del término (*political functions*), resisten el análisis constitucional siempre que guarden un nexo racional con el interés que el estado tiene en perpetuar los valores comunitarios. Véanse, en general: 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 18.12 (1986); L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, Sec. 16-23.

A partir de *Sugarman v. Dougall*, supra, el concepto de función política ha sido utilizado con éxito para excluir a los extranjeros de los jurados estatales, *Perkins v. Smith*, 370 F. Supp. 134 (D. Md. 1974), confirmado en 426 U.S. 913 (1976); de la policía estatal, *Foley v. Connelie*, 435 U.S. 291 (1978); del magisterio público, *Ambach v. Norwick*, supra, y de cargos de oficial probatorio, *Cabell v. Chavez-Salido*, supra.

En Estados Unidos algunos autores han criticado este desdoblamiento en el enfoque de la cláusula. Se ha dicho que el estado o condición de extranjería constituye un concepto unívoco que requiere un tratamiento constitucional uniforme. Nota, *A Dual Standard for State Discrimination Against Aliens*, 92 Harv. L. Rev. 1516 (1979); Nota, *Alien Teachers: Suspect Class or Subversive Influence?*, 31 Mercer L. Rev. 815 (1980); M.R. Walter, *The Alien's Right to Work and the Political Community's Right to Govern*, 25 Wayne L. Rev. 1181 (1979); Nota, *Aliens' Right to Teach: Political Socialization and the Public Schools*, 85 Yale L.J. 90 (1975). Otros autores han recomendado la fórmula de escrutinio intermedio para las situaciones previstas en *Sugarman v. Dougall*, supra, y progenie, por entender que así se atienden mejor los intereses en juego. Comentario, *Alienage and Public Employment: the Need for an Intermediate Standard in Equal Protection*, 32 Hastings L.J. 163 (1980). El Tribunal Supremo, sin embargo, ha perseverado en su orientación, si bien profundamente dividido.

La parte apelada admite que el caso de *Ambach v. Norwick*, supra, es particularmente relevante al de autos. En *Ambach*, supra, el Tribunal Supremo extendió la excepción aludida a los maestros de escuela pública. Dicho Foro resolvió que el estado de Nueva York podía exigir válidamente la ciudadanía norteamericana como requisito para la obtención de un certificado de maestro. El escrutinio utilizado fue el de nexo racional. La decisión subraya fundamentalmente la importancia del maestro dentro del sistema educativo nortea-

mericano. Son ellos quienes preparan y condicionan a los jóvenes para ejercer en el futuro las prerrogativas del sistema democrático de gobierno. También inculcan los valores éticos fundamentales de nuestra sociedad.

Existe, no obstante, una diferencia estimable entre *Ambach v. Norwick*, supra, y el caso de autos. El estatuto del estado de Nueva York, contrario al nuestro, facultaba al Comisionado de Educación a crear excepciones a la prohibición general y así expedir certificados temporeros. *De su faz la legislación sólo aplicaba a los extranjeros elegibles para obtener la ciudadanía pero que la habían rechazado. Dicha circunstancia va a la esencia misma de la razón de decidir allí utilizada.* Véanse: Nota, *A Dual Standard for State Discrimination Against Aliens*, supra, pág. 1536; Nota, *Alien Teachers: Suspect Class or Subversive Influence?*, supra, pág. 820.

De la exposición anterior se desprende que las cuestiones jurídicas presentes en el caso de epígrafe constituyen actualmente un punto de intenso conflicto en la doctrina y jurisprudencia norteamericana. Resta examinar el planteamiento bajo nuestros propios parámetros constitucionales y las actuales relaciones entre Estados Unidos y Puerto Rico. *Pueblo v. Dolce*, 105 D.P.R. 422, 428–430 (1976).

IV

■ La Ley Núm. 94, *supra*, regula de forma abarcadora la certificación de los maestros en el sistema de instrucción pública y, hasta hace poco tiempo, de los maestros de las escuelas privadas acreditadas. La ley define en el Art. 1 el término "certificado de maestro" como el "[d]ocumento expedido por el Secretario de Instrucción Pública, que faculta al tenedor a realizar la labor docente o técnica especificada en el mismo". Art. 1 (18 L.P.R.A. sec. 260(1)). El Art. 7 de la misma ley, por otra parte, expresa que dicho Secretario está impedido de extender o aprobar nombramiento alguno en fa-

vor de una persona que previamente no posea un certificado de maestro en vigor. 18 L.P.R.A. sec. 266.

El esquema dispone los requisitos generales de los candidatos, Art. 5 (18 L.P.R.A. sec. 264); las normas adicionales de preparación académica y profesional, Art. 6 (18 L.P.R.A. sec. 265); la expedición de certificados vitalicios, Art. 9 (18 L.P.R.A. sec. 268); los certificados provisionales de aquellas personas que no reúnen los requisitos de experiencia o de preparación académica, Art. 11 (18 L.P.R.A. sec. 270); la expedición de certificados a base de criterios de reciprocidad, Art. 14 (18 L.P.R.A. sec. 273); la cancelación y sus causas, Art. 1 de la Ley Núm. 115 de 30 de junio de 1965 (18 L.P.R.A. sec. 274), etc.

Al momento de presentarse la demanda de epígrafe, el Art. 5 de la Ley Núm. 94, *supra*, exigía el requisito de ciudadanía sin hacer distinción entre escuelas públicas o privadas. El 18 de julio de 1986, sin embargo, la Legislatura enmendó la ley a los efectos de eliminar el requisito de ciudadanía americana para los maestros de escuelas privadas. De la exposición de motivos de la propia Ley Núm. 152, de fecha antes citada, surge que el legislador entendía necesaria esta medida "por dos razones; primero, porque permitir que los extranjeros enseñen en las escuelas privadas es una política pública acertada, y segundo, porque impedir que los extranjeros enseñen en las escuelas privadas sería inconstitucional". Informe de la Comisión de Instrucción y Cultura de la Cámara de Representantes previo estudio y consideración del P. de la C. 897, págs. 1–2. Luego de esta enmienda es evidente que la apelada sólo puede cuestionar la validez constitucional del Art. 5(1), de la Ley Núm. 94, *supra*, en la medida que le requiere ser ciudadana norteamericana para poder trabajar *en las escuelas públicas del país*. Limitada así la controversia, debemos determinar si la ciudadanía norteamericana puede ser el fundamento de una clasificación permisible por el Gobierno de Puerto Rico.

El Art. II, Sec. 1 de la Constitución del Estado Libre Asociado, *supra*, ed. 1982, pág. 257, dispone:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, nacimiento, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana.

Por su parte, el Art. II, Sec. 7 de la Constitución del Estado Libre Asociado, *supra*, ed. 1982, pág. 275, afirma:

> Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad. No existirá la pena de muerte. *Ninguna persona será privada de su libertad o propiedad sin debido proceso de ley, ni se negará a persona alguna en Puerto Rico la igual protección de las leyes.* No se aprobarán leyes que menoscaben las obligaciones contractuales. Las leyes determinarán un mínimo de propiedad y pertenencias no sujetas a embargo. (Énfasis suplido.)

La dignidad y la igualdad ante la ley como principio axiológico es indiscutible. Pertenece a la categoría de derechos universales y fundamentales del hombre. *La Nueva Constitución de Puerto Rico*, Río Piedras, Escuela de Administración Pública, Ed. U.P.R., 1954, págs. 24 y 218.

A pesar de ello, la Asamblea Constituyente no concibió el discrimen por razón de extranjería como uno de los expresamente prohibidos por el Art. II, Sec. 7 de nuestra Constitución, *supra*. Se ha especulado en torno al término "nacimiento". Sin embargo, a poco examinamos el legajo de la Asamblea Constituyente vemos que la intención fue otra. "Se propon[ía] eliminar el estigma jurídico en contra de los hijos habidos fuera del matrimonio." Véase Informe de la Comisión de Carta de Convención Constituyente de Puerto Rico, 4 Diario de Sesiones de la Convención Constituyente

2560, 2562 (1951). La intención era exclusivamente establecer "la igualdad de los hijos en la vida civil". 2 Diario de Sesiones de la Convención Constituyente 1374 (1952).

Aún más, existía la preocupación entre algunos miembros de la Asamblea Constituyente de que fuera a interpretarse el vocablo "nacimiento" de forma dilatada al punto de incluir a "las personas nacidas fuera de Puerto Rico". Diario de Sesiones, *supra*, Vol. 2, pág. 1375. Véase, también, Diario de Sesiones, *supra*, Vol. 4, pág. 2562.

La situación provocó que el delegado señor González Blanes sugiriera incluso la eliminación por completo del término. Diario de Sesiones, *supra*, Vol. 2, pág. 1384. Si la enmienda no prosperó fue porque la Asamblea Constituyente entendió que el alcance de la palabra "nacimiento" había quedado suficientemente aclarada en el Informe de la Comisión de Carta de Convención Constituyente de Puerto Rico. Íd., pág. 1380.

■ Lo dicho no dispone de la controversia. En *León Rosario v. Torres*, 109 D.P.R. 804, 813 (1980), señalamos que las clasificaciones fundamentadas en "nacionalidad" eran inherentemente sospechosas y, por lo tanto, estaban sujetas a un riguroso análisis constitucional.[3] La expresión surgió originalmente en *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972), donde añadimos el vocablo "nacionalidad" al catálogo del Art. II, Sec. 1 de la Constitución del Estado Libre Asociado, *supra*, en evidente reconocimiento de que dicha disposición no es *numerus clausus*. *Zachry International v. Tribunal Superior*, 104 D.P.R. 267, 277 (1975), sigue esta trayectoria.

---

[3] Aunque para efectos del derecho internacional público los términos "nacionalidad" y "ciudadanía" no constituyen conceptos sinónimos, desde el punto de vista de la garantía constitucional representan idéntico valor.

■ Nuestros pronunciamientos en *Wackenhut Corp. v. Rodríguez Aponte*, supra, en *Zachry International v. Tribunal Superior*, supra, y en *León Rosario v. Torres*, supra, no constituyen un *dictum* sin consecuencia. Si bien no responden al criterio sustentado expresamente en la Convención Constituyente, reconocen desarrollos habidos en la jurisprudencia federal. Después de todo, "[i]nterpretamos una Constitución, no los Rollos del Mar Muerto". *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328, 350 (1983). En *Wackenhut*, supra, caso resuelto en 1972, citamos a *Graham v. Richardson*, supra, como precedente. Al así hacerlo, interpretamos nuestra Carta de Derechos de forma compatible con lo resuelto un año antes en *Graham*, supra. Las expresiones vertidas por el Tribunal Supremo federal en esta área son obligatorias para este Tribunal toda vez que los derechos protegidos por las cláusulas del debido proceso de ley y de la igual protección de las leyes de la Constitución de Estados Unidos son aplicables a Puerto Rico. *Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328 (1986); *Examining Bd. v. Flores de Otero*, supra, págs. 599–601; *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 668 (1974). Véase, también, J.J. Álvarez González, *La protección de los derechos humanos en Puerto Rico*, 57 Rev. Jur. U.P.R. 133, 143 *et seq.* (1988).

■ El análisis bajo el Art. II, Sec. 7 de la Constitución del Estado Libre Asociado, *supra*, nos conduce a parecidos resultados. En su cobertura, el término "persona" no tiene menor contenido que el homólogo bajo la Constitución federal. Aclarado este extremo, no es necesario repetir recuentos. En innumerables ocasiones hemos expresado que cuando una clasificación legislativa afecta derechos fundamentales o es sospechosa la misma está sujeta a un estricto escrutinio judicial. *Zachry International v. Tribunal Superior*, supra, pág. 277; *León Rosario v. Torres*, supra, pág. 813. En estas situaciones el Estado debe demostrar la

existencia de un interés público apremiante que justifique dicha clasificación y, además, que ésta promueve o adelanta la consecución de ese interés. Se "considera[n] inherentemente sospechosas, todas las clasificaciones tangentes con la dignidad del ser humano y con el principio de la igualdad ante la ley". *León Rosario v. Torres*, supra, pág. 813.

Por supuesto, la Constitución no impide que las leyes dispongan situaciones distintas cuando el discrimen no es arbitrario ni responde a un propósito de hostilidad contra determinado grupo. Además, es indiscutible la facultad que tiene el Estado para reglamentar razonablemente ciertas profesiones por motivo de utilidad general. Ello incluye la comprobación de conocimientos indispensables y la necesaria solvencia moral del candidato. *Santiago v. Trib. Exam. de Médicos*, 118 D.P.R. 1 (1986); *Pérez v. Junta Dental*, 116 D.P.R. 218 (1985).

La ciudadanía condiciona y define importantes derechos y obligaciones en nuestra sociedad. Basta decir que sirve de fundamento al ejercicio de los derechos políticos. Es concebible que el Estado tenga la facultad de fijar restricciones racionales a la capacidad laboral de los extranjeros en ciertas posiciones gubernamentales que por su naturaleza inciden sobre la misma esencia e integridad de nuestro sistema de gobierno. La delimitación será difícil en los casos fronterizos. Por lo general, las restricciones en este campo sólo se justifican en aquellas funciones —además de las electivas— que participen directamente en la formulación y revisión de la política pública del país o que por su naturaleza conlleven poder discrecional significativo en el proceso gubernamental. Aun en estos casos el Estado no puede establecer criterios totalmente arbitrarios. *Treatise on Constitutional Law*, supra, pág. 491; *Cabell v. Chavez-Salido*, supra, págs. 439–441.

 A la luz de estos criterios, y aun aceptando que no se afecta de forma impermisible el derecho al empleo de la apelada,[4] el Estado no ha podido sustraer la presente controversia de la norma general: las clasificaciones por razón de ciudadanía son inherentemente sospechosas. Como advertimos, la disposición en controversia en *Ambach v. Norwick*, supra, difiere en aspectos básicos de la aquí presente.

No cabe duda de que la función magisterial ocupa un lugar importante en nuestra escala de valores sociales. Ello no causa polémica. Lo que sí está planteado en el presente caso es si el criterio de ciudadanía de Estados Unidos es condición indispensable a la idoneidad profesional de la apelada o constituye un atributo irreemplazable, en cuya ausencia De Paz Lisk no puede ser portavoz adecuado de los valores comunitarios de la sociedad puertorriqueña. Tampoco hay unas circunstancias especiales en el país que requieran que en nuestras escuelas públicas sea razonable exigir esta condición.

La clasificación que configura la norma cuestionada, aunque no revela a primera vista rasgos "congénitos" o "inmutables" —raza, color, sexo, nacimiento— sí participa de un ingrediente importante en toda clasificación sospechosa. "[T]iende a relegar a un estado legal de inferioridad a una clase con abstracción de las potencialidades y características individuales de sus miembros." *Zachry International v. Tribunal Superior*, supra, pág. 282. Véanse: E. Hull, *Without Justice for All: The Constitutional Rights of Aliens*, Connecticut, Greenwood Press, 1985, pág. 85 *et seq.*; Comentario, *Alienage and Public Employment: The Need for an Intermediate Standard in Equal Protection*, supra, pág. 197; *Mathews v. Lucas*, 427 U.S. 495, 505 (1976); *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973); *Reed v. Reed*, 404 U.S.

---

[4] En el presente caso la restricción de trabajo no constituye una prohibición total.

71 (1971); *Goesaert v. Cleary*, 335 U.S. 464 (1948). Tal enfoque "repugna al sistema jurídico puertorriqueño". Diario de Sesiones, *supra*, Vol. 4, pág. 2561. De hecho, en 1959 el Comité del Gobernador para el Estudio de los Derechos Civiles examinó este requisito de empleo para los maestros y recomendó su eliminación porque era contrario a los derechos fundamentales reconocidos en nuestra Carta de Derechos. Art. II, Const. E.L.A., *supra*. En lo pertinente, dicho informe establece:

> No nos parece justificado el requisito de ciudadanía para obtener certificado de maestro porque es irrelevante para la determinación de idoneidad profesional, elimina a muchos candidatos valiosos que podrían enriquecer nuestra educación y resulta injusto desde el punto de vista de los derechos fundamentales. En este sentido es interesante notar que el Artículo 2 de la Declaración Universal de Derechos Humanos de las Naciones Unidas, que inspiró la Sección 1 de nuestra Carta de Derechos, incluye entre los discrímenes prohibidos los resultantes del "origen nacional". El requisito de ciudadanía podrá justificarse en otras conexiones pero no hace falta para tener carta de maestro. Cada candidato puede juzgarse individualmente en lo referente a su capacidad para el magisterio en Puerto Rico. La ciudadanía no se requiere para pertenecer a la facultad de la Universidad de Puerto Rico. Informe del Comité del Gobernador para el Estudio de los Derechos Civiles, agosto de 1959, 1959-C.D.C.-001, 1 Der. Civ. 25, 41 (1973).

Por otro lado, existen otros medios menos gravosos que el Estado puede utilizar para asegurarse de que los maestros de escuelas primarias puedan educar a nuestros hijos y transmitir de forma apropiada nuestros valores.

El D.I.P. cuenta con suficientes mecanismos de supervisión y comprobación para asegurarse de que un candidato está en condiciones de comunicar los valores políticos, sociales y morales de esta sociedad —dentro de un ambiente no reñido con los principios de libertad de pensamiento y expre-

sión— sin tener que recurrir a una norma de preterición automática. De Paz Lisk tuvo que cursar estudios en una "institución colegial o universitaria debidamente acreditada" por el Estado como parte de los requisitos generales exigidos a todo candidato. 18 L.P.R.A. sec. 264(5). Si el Secretario del Departamento de Instrucción Pública considera que ello no es suficiente, está facultado para establecer, por reglamento, normas de preparación académica y profesionales *adicionales* para los candidatos no ciudadanos en aquellas áreas que ofrezcan una mejor visión de nuestra historia, costumbres y valores. Nuevamente, ante los intereses en conflicto, la prohibición resulta *innecesariamente abarcadora y arbitraria.* Como resultado, los extranjeros son juzgados a base de su estado legal en el país y no en virtud de sus características personales. El requisito del inciso primero del Art. 5 de la Ley Núm. 94, *supra*, opera, a lo sumo, como incentivo para que más extranjeros se hagan ciudadanos de Estados Unidos, pero no representa un criterio de lealtad o idoneidad profesional en el magisterio puertorriqueño.

Aquellas personas que no son ciudadanas están absolutamente impedidas de ejercer su profesión —enseñar— en el sistema público de enseñanza. Ello incluye la escuela elemental —grados del primero al sexto— y la escuela secundaria, que comprende la escuela intermedia y superior. Tampoco hay especificación en cuanto a la labor docente, ya sea en la historia, las matemáticas o la educación física. Existe una presunción insuperable de que los extranjeros no naturalizados no pueden contribuir a los esfuerzos educativos de una sociedad. La ley no dispone excepciones ni toma en consideración si la persona tiene residencia legal en Puerto Rico y en Estados Unidos, el tiempo que ha vivido aquí o su preparación académica. No estamos ante una persona extranjera que aspira a una posición directiva o de formulación de la política pública dentro del sistema de instrucción pública. En este caso se trata de una maestra de escuela elemental y

secundaria que es residente legal de Estados Unidos y Puerto Rico, y que desea enseñar español a nuestros jóvenes. ¿Es imprescindible ser ciudadano norteamericano para instruir en la poesía de Luis Lloréns Torres, en la novela de Luis Rafael Sánchez?

Por último, la Ley Núm. 152, *supra*, que enmienda la Ley Núm. 94, *supra*, para permitir a los extranjeros que trabajen en las escuelas privadas, lejos de corregir la situación agrava la inequidad del diseño. Si el estado acepta que "las escuelas privadas realizan una función vital en nuestra sociedad" —Informe de la Comisión de Instrucción y Cultura, *supra*, pág. 2— y los maestros desempeñan en Puerto Rico alegadamente funciones que van a la médula de nuestro sistema de gobierno, ¿cómo justificar entonces un trato distinto? Más allá de lo meramente accidental, ¿no son los jóvenes de nuestras escuelas privadas acreedores a una educación igualmente comprometida con nuestros más preciados valores?

En conclusión, nuestro estatuto es categórico al negarle un certificado de maestro a *todo extranjero sin hacer excepciones.* Los excluye del magisterio sin tomar en consideración, entre otros factores, la materia a enseñarse, el nivel de enseñanza, la naturaleza de la relación del extranjero con este país, las demostraciones de fidelidad a nuestros valores, la intención de hacerse ciudadanos(5) o si tiene permiso de residencia expedido por el Servicio de Inmigración y Naturalización. Hay métodos menos drásticos para conseguir los fines perseguidos por el Estado. La posibilidad de que unos extranjeros sean inadecuados para ser maestros no justifica que la prohibición cubra absolutamente a todos los ex-

---

(5) Como expresamos, esta es la norma del estado de Nueva York que fue objeto de análisis en el caso de *Ambach v. Norwick,* supra. En dicho estado se prohibía certificar como maestro de escuela pública a las personas que no fueran ciudadanos de Estados Unidos, a menos que la persona hubiese manifestado su intención de solicitar la ciudadanía americana.

tranjeros, incluso a los que tienen tarjeta de residente de Estados Unidos.

En vista del carácter ilimitado de la prohibición de la ley en controversia, la única forma de extender los beneficios del estatuto a los extranjeros con residencia es mediante eliminación del requisito de ciudadanía americana, es decir, la supresión del inciso primero del Art. 5 de la Ley Núm. 94, *supra*. Dicha disposición atenta contra los principios de igualdad ante la ley de las Secs. 1 y 7 del Art. II de nuestra Constitución, *supra*.

## V

El Estado plantea que erró el tribunal de instancia al concederle a la demandante $10,000 por concepto de daños personales. Invoca su inmunidad por los actos u omisiones de sus funcionarios o empleados "en el cumplimiento de una ley o reglamento, aun cuando éstos resultaren ser nulos . . .". 32 L.P.R.A. sec. 3081(a). Además, entiende que resulta improcedente la imposición de daños a los demandados en su carácter personal por gozar estos funcionarios de inmunidad cualificada en el desempeño de sus funciones oficiales.[6]

A tenor con la Ley de Reclamaciones y Demandas contra el Estado (en adelante Ley de Pleitos), Ley Núm. 104 de 29 de junio de 1955 (32 L.P.R.A. sec. 3077 *et seq.*), se puede demandar al Gobierno por los daños y perjuicios causados por actuaciones culposas de sus agentes o empleados en el descargo de sus funciones oficiales o, en la alternativa, se puede demandar directamente al agente o funcionario. Sin

---

[6] Una interpretación lata de la tercera defensa afirmativa levantada por el Estado en su contestación a la demanda permite inferir ambas defensas. Además, *quaere* si la defensa de inmunidad del soberano es renunciable. Véase bajo el *Federal Tort Claims Act*, 28 U.S.C. secs. 1346(b), 2671, 2680, 2680(a), de donde procede nuestro estatuto; *Hydrogen Technology Corp. v. United States*, 831 F.2d 1155, 1161, 1162 n.6 (1er Cir. 1987).

embargo, no se puede instar la acción directamente contra el empleado público una vez se dicta sentencia contra el Estado o viceversa. *Vázquez Negrón v. E.L.A.*, 113 D.P.R. 148 (1982). En *Vázquez Negrón*, supra, pág. 151 esc. 3, dejamos sin resolver si el empleado y el Estado se pueden acumular procesalmente en el mismo pleito, no obstante lo expresado originalmente en *Vda. de Valentín v. ELA*, 84 D.P.R. 112 (1961).

◼ Contestamos en la afirmativa dicha interrogante. No cabe duda de que lo que persigue la Ley Núm. 104, *supra*, es evitar que un demandante recobre tanto del Gobierno como del empleado. Ahora bien, según la propia Ley Núm. 104, *supra*, y las Reglas de Procedimiento Civil, la situación es ciertamente análoga a cualquier otra de acumulación permisible de partes. Regla 17.1 de Procedimiento Civil, 32 L.P.R.A. Ap. III. No existe impedimento alguno para que la demanda se dirija de forma alternativa, siempre que no haya acumulación de indemnizaciones. El cobro de cualquier sentencia opera como medio de satisfacer la otra.[7]

◼ La controversia en esta ocasión es de naturaleza sustantiva. Está claro que el Estado en el presente caso no invoca para sí la inmunidad cualificada de que pueden gozar los oficiales y empleados públicos en el descargo de sus deberes, sino la exclusión de acciones que prescribe el Art. 6(a) de la Ley Núm. 104, *supra*, 32 L.P.R.A. sec. 3081(a). El hecho de que el Estado asuma la representación legal y respaldo económico del funcionario demandado no significa que renuncie a su inmunidad soberana. Art. 12, *in fine*, de la Ley

---

[7] Este es el enfoque bajo el *Federal Tort Claims Act*, 28 U.S.C. sec. 2676, cuando existe jurisdicción federal independiente. *Benbow v. Wolf*, 217 F.2d 203 (9no Cir. 1954); *Williams v. United States*, 405 F.2d 951, 953–954 (9no Cir. 1969); *Morris v. United States*, 521 F.2d 872 (9no Cir. 1975); *Moon v. Price*, 213 F.2d 794 (5to Cir. 1954).

Núm. 9 de 26 de noviembre de 1975 (1975 Leyes de Puerto Rico, Parte 2, págs. 1043, 1044–1045).

Le asiste la razón al Estado en este punto. Es preciso señalar que no estamos ante planteamiento jurídico de orden constitucional que cuestione los poderes de la Rama Legislativa para limitar las circunstancias bajo las cuales el Estado Libre Asociado debe responder por los daños que causen sus agentes o empleados.

Aclarado este extremo, surge que el Art. 6(a) de nuestra Ley de Pleitos, *supra*, tiene su fuente en la fórmula más amplia de la Sec. 2680(a) del *Federal Tort Claims Act*, 28 U.S.C. En lo pertinente, la norma persigue proteger al gobierno de demandas que tengan como fin impugnar la constitucionalidad de cualquier legislación a través del recurso ordinario en daños y perjuicios. Véase *Dalehite v. United States*, 346 U.S. 15 (1953). En el fondo late la excepción de la "función de carácter discrecional" que nuestra Ley de Pleitos establece separadamente en el Art. 6(b), 32 L.P.R.A. sec. 3081(b).

■ Por supuesto, bajo nuestro esquema constitucional de separación de poderes, la Legislatura no puede impedir que mediante los mecanismos del *injunction* o de la sentencia declaratoria este Foro pase juicio sobre la constitucionalidad de cualquier legislación. Tradicionalmente éste ha sido el remedio enérgico y efectivo para el restablecimiento del orden constitucional. En acciones de daños y perjuicios contra el Estado, no obstante, rige la Ley de Pleitos y por disposición expresa —Art. 6(a), *supra*, en este caso— subsiste la inmunidad soberana. Véase, con fines comparativos, *Civil Actions against State Government: Its Divisions, Agencies and Officers*, Colorado, Shepard's/McGraw-Hill, 1982, Sec. 2.29, págs. 56–60.

La materia de la responsabilidad de los codemandados en su carácter personal requiere un análisis diferente. El Gobierno nos pide que adoptemos en Puerto Rico el concepto

de "inmunidad condicionada", doctrina de génesis judicial cuyos contornos delineamos en *Acevedo v. Srio. Servicios Sociales*, 112 D.P.R. 256 (1982).

No cabe duda de que como cuestión de política pública es menester que los servidores públicos estén protegidos contra demandas presentadas en su contra por el hecho de haber ejercido de forma razonable y de buena fe funciones que contienen un elemento de *discreción*. Se persigue que estos funcionarios actúen con libertad y tomen decisiones sin sentir presiones y amenazas contra sus patrimonios. La Ley Núm. 9, *supra*, responde a esta preocupación.[8]

Este no es el caso apropiado, sin embargo, para iniciar esa trayectoria. El Secretario del Departamento de Instrucción Pública no tiene discreción alguna para extender un certificado de maestro a un extranjero no naturalizado. No existe margen para el juicio. En realidad, en cuanto a este aspecto, estamos ante una función de carácter ministerial que no pertenece a la naturaleza de aquellas que están protegidas por la inmunidad invocada.

En lo tocante a las actuaciones puramente ministeriales, los funcionarios de gobierno están sujetos a normas ordinarias de responsabilidad civil. Según este enfoque, no es equitativo imponerle responsabilidad a los codemandados en su carácter personal cuando la misma está predicada exclusivamente en que llevaron a cabo unas operaciones de gobierno de acuerdo con directrices oficiales. No hubo alegación ni prueba de mala fe, de malicia o tan siquiera de error en la conducta de estos empleados.

---

[8] En *Feliciano Rosado v. Matos, Jr.*, 110 D.P.R. 550 (1981), adoptamos una norma de inmunidad judicial condicionada.

*Procede modificar la sentencia del tribunal de instancia únicamente en la medida en que halló responsables a los codemandados en su carácter personal, y así modificada se confirma.*

Los Jueces Asociados Señores Negrón García y Rebollo López emitieron opiniones disidentes. La Juez Asociada Señora Naviera de Rodón concurre con el resultado sin opinión escrita.

—O—

Opinión disidente del Juez Asociado Señor Negrón García.

Minerva De Paz Lisk, de nacionalidad y ciudadanía dominicana, impugnó con éxito en el Tribunal Superior, Sala de San Juan (Hon. Wilfredo Alicea López, J.), la constitucionalidad del requisito de ciudadanía[1] para la obtención de un certificado de maestra para desempeñarse como tal en el Departamento de Instrucción Pública de Puerto Rico. Art. 5 de la Ley Núm. 94 de 21 de junio de 1955,[2] según enmendada, 18 L.P.R.A. sec. 264.

Argumentó que el requisito constituía un discrimen por razón de extranjería, violatorio de las cláusulas del debido proceso de ley e igual protección de las leyes de la Constitución federal, y del Art. II, Secs. 1 y 7 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1.

A petición del Procurador General examinamos la juridicidad de ese decreto.[3] En vista de que los hechos que dan génesis a esta controversia aparecen fielmente resumidos

---

[1] "Ser ciudadano de Estados Unidos de América". 18 L.P.R.A. sec. 264.

[2] Además, invocó el Art. II, Sec. 16 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1 (derecho de todo trabajador a escoger libremente su ocupación); la Ley Federal de Derechos Civiles, 42 U.S.C. sec. 1983, y la Ley de Derechos Civiles de Puerto Rico. 32 L.P.R.A. sec. 3524.

[3] Nuestro curso decisorio nos releva de examinar el aspecto relacionado con la imposición de daños a los demandados en su carácter personal.

tanto en la opinión mayoritaria como en la opinión disidente del Juez Asociado Señor Rebollo López, nos abstendremos de exponerlos nuevamente. Pasamos directamente a plasmar los fundamentos de esta disidencia.

I

De entrada es menester calibrar el prisma. Cualquier análisis de la validez constitucional de este estatuto debe ubicarse en el contexto de las peculiares condiciones nuestras. No podemos desentendernos de que "[e]l problema primario (como en los demás órdenes de la vida puertorriqueña) es que el gobierno federal ejerce en Puerto Rico sus vastos poderes, en este caso sobre la inmigración, la naturalización y la ciudadanía, sin que los puertorriqueños participen, por medio de sus votos, en la aprobación de las leyes pertinentes y en la elección o nombramiento de los funcionarios encargados de ponerlas en vigor. Estados Unidos ejerce sus poderes conforme con sus necesidades y objetivos y sin tomar en cuenta la enorme densidad poblacional y la débil economía de Puerto Rico". R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II, pág. 1188.

Así que la situación en Puerto Rico impone unas consideraciones especiales porque especial es también su condición política, geográfica, social y cultural. Hay una usanza, una tradición, un modo peculiar de ser y de entender la actividad vital que configuran nuestra personalidad de pueblo. Por eso, todo análisis judicial debe sujetarse a ese hecho incontrastable. Existen unos valores puertorriqueños y existen unas circunstancias que matizan de una forma peculiar lo que atañe a la vida colectiva. Una de esas circunstancias es la limitada potestad para ejercer nuestra soberanía. En un caso como el que nos ocupa debe legitimarse el ejercicio de esa exigua soberanía a la luz de nuestro particular perfil.

Por todos es aceptado —incluso por la opinión mayoritaria— la más reciente tendencia del Tribunal Supremo fede-

498

ral de permitirle a los estados reglamentar el ingreso de extranjeros a ciertos puestos públicos mediante el requisito de ciudadanía de Estados Unidos. De manera que, en ausencia de impedimentos constitucionales, estatutarios o jurisprudenciales de índole federal, y de trabas que emanen de nuestra propia Constitución —como demostraremos más adelante— no vemos razones para que le neguemos a la Asamblea Legislativa la facultad de utilizar ese reducido ejercicio de soberanía.(4)

II

El reconocimiento por el Tribunal Supremo de Estados Unidos en 1886 —*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)— de que los extranjeros son "personas" para fines de la En-

---

(4) "Sin que se pretenda agotar el tema, inclu[i]mos a continuación algunas disposiciones que imponen el requisito de ciudadanía de Estados Unidos.

*"(1) Ley de Relaciones Federales*

"La Sec. 10 exige que todos los funcionarios (officers) del gobierno sean ciudadanos y la Sec. 36 que lo sea también el Comisionado Residente de Puerto Rico en Washington.

*"(2) Constitución*

"Art. III, Sec. 5 — los legisladores, quienes también deben ser ciudadanos de Puerto Rico y residentes por dos años; Art. IV, Sec[.] 3 — el Gobernador, quien además debe ser ciudadano y residente *bona fide* de Puerto Rico; Art. IV, Sec. 5 — exige que el Secretario de Estado reúna los mismos requisitos que el Gobernador; y Art. V[,] Sec. 9 — los jueces del Tribunal Supremo, quienes, además, deben ser ciudadanos de Puerto Rico y residentes durante cinco años.

*"(3) Leyes*

"Se exige la ciudadanía a los electores (16 L.P.R.A. [sec.] 3053), los médicos (20 L.P.R.A. [sec.] 43), los maestros (18 L.P.R.A. [sec.] 264), los agrónomos (20 L.P.R.A. [sec.] 624), los contadores (20 L.P.R.A. [sec.] 774), los técnicos de refrigeración (20 L.P.R.A. [sec.] 2059), los técnicos dentales (20 L.P.R.A. [sec.] 2094), los miembros de la Guardia Nacional (25 L.P.R.A. [sec.] 2054), y los detectives privados (25 L.P.R.A. [sec.] 285 (c)).

"También se exige a los miembros de diversas juntas examinadoras (20 L.P.R.A. [secs.] 463, 532, 554, 580a, 629, 683, 773, 903, 1033, 2051, 2092, 2132[)]. Véase también el Art. 154 del Código Penal (33 L.P.R.A. [sec.] 4195) que, entre otros, prohíbe el discrimen por 'origen nacional' en sitios públicos, transportes, vivienda y empleo." R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, 1ra ed., San Juan, Ed. C. Abo. P.R., 1988, Vol. II, págs. 1188–1189.

mienda Decimocuarta de la Constitución federal, inició una clara tendencia para salvaguardar a los extranjeros del discrimen que culminó en el importante caso de *Graham v. Richardson*, 403 U.S. 365 (1971). Allí, se resolvió sin ambajes que las clasificaciones fundadas en extranjería son "inherentemente sospechosas". Como corolario, cualquier legislación fundada en dichas clasificaciones debía resistir un estricto escrutinio judicial para salvar su constitucionalidad. Entre esas clasificaciones están las que han pretendido limitar la oportunidad de extranjeros al ejercicio de una profesión u oficio. Véase *In re Griffiths*, 413 U.S. 717 (1973).

Sin embargo, la regla de *Graham v. Richardson*, supra, no impidió que dicho Tribunal reconociera, como excepción, la doctrina de la "función política". *Sugarman v. Dougall*, 413 U.S. 634 (1973); *Perkins v. Smith*, 426 U.S. 913 (1976); *Foley v. Connelie*, 435 U.S. 291 (1978). En síntesis, la misma propugna que los estados pueden tener un legítimo interés en preservar para los ciudadanos ciertos puestos públicos relacionados estrechamente con el proceso de autogobierno o que conllevan el ejercicio de poderes importantes en la comunidad. Esta doctrina fue seguida en *Ambach v. Norwick*, 441 U.S. 68 (1979). Este caso, por su parecido con el de autos, amerita una amplia discusión.

Se trataba de un estatuto que le prohibía a extranjeros no ciudadanos (residentes) obtener un certificado permanente para desempeñarse como maestros en las escuelas públicas del estado de Nueva York, a menos que hubiesen manifestado su intención de solicitarla. El Tribunal Supremo federal resolvió que dicha ley no violaba la cláusula de igual protección de las leyes de la Enmienda Decimocuarta.

Se justificó la exclusión de los extranjeros de esos puestos públicos demostrando una relación racional entre el interés perseguido por la legislación y la clasificación. Se reconoció que la función de la educación pública y el grado de responsabilidad y discreción que tienen los maestros en el

cumplimiento de esta función convierte a estos maestros en entes cubiertos por el principio de "función gubernamental" reconocido en *Sugarman v. Dougall,* supra, y en *Foley v. Connelie,* supra. De acuerdo con este esquema los maestros, al igual que los policías, cumplen con una obligación fundamental del gobierno con su comunidad. Sobre este particular, el Juez Powell precisó:

En el sistema de instrucción pública, los maestros desempeñan un papel crítico en el desarrollo de las actitudes de los estudiantes hacia el gobierno y el entendimiento del papel de los ciudadanos en nuestra sociedad. De los empleados del sistema, los maestros son los que están en contacto directo, día a día, con los estudiantes en los salones de clases y en otras actividades variadas de la escuela moderna. En el tratamiento de las experiencias de los estudiantes para el logro de los objetivos educativos, los maestros por necesidad tienen una amplia discreción en cuanto a la manera en que se le comunica la materia a los estudiantes. Ellos son responsables de presentar y explicar la materia de manera comprensible e inspiradora. Ninguna estandardización [normalización] de los materiales didácticos o de los planes de enseñanza puede eliminar las cualidades personales que el maestro aporta en el logro de esas metas. Más aún, el maestro sirve de modelo para sus estudiantes, ejerciendo una sutil pero importante influencia en sus percepciones y valores. Así, a través de la presentación de los materiales del curso y el ejemplo que dé, el maestro tiene la oportunidad de influir en las actitudes de los estudiantes hacia el gobierno, el proceso político y las responsabilidades sociales del ciudadano. Esta influencia es crucial para el continuo bienestar de la democracia. (Traducción nuestra.) *Ambach v. Norwick,* supra, págs. 78–79.

La reciente enmienda del Art. 5 de la Ley Núm. 94, *supra,* por la Ley Núm. 152 de 18 de julio de 1986, a los fines de concederle a los extranjeros la oportunidad de obtener el certificado de maestro para enseñar en las escuelas privadas del país, demuestra que el legislador sigue considerando acertada la política prevaleciente en cuanto a las escuelas públicas. En el Informe de la Comisión de Instrucción y Cul-

tura de la Cámara de Representantes, 1986, pág. 2, que recomendó la aprobación del P. de la C. 897, se concluyó que "[e]l requisito de ciudadano americano es válido para los maestros de escuelas públicas y debe mantenerse".

Por ser ésta la situación, y ante el tipo de escrutinio judicial que hemos utilizado para pasar juicio sobre la constitucionalidad de la Ley Núm. 94, *supra*, somos de la firme convicción que debemos guardar la debida deferencia a la Asamblea Legislativa.

## III

Para justificar la inconstitucionalidad de esta legislación, la mayoría del Tribunal se ampara en dos (2) hechos: la ausencia de impedimentos jurídicos para que residentes puedan desempeñarse como maestros en las escuelas privadas del país y en la Universidad de Puerto Rico. Ambas situaciones merecen cualificarse y discutirse separadamente. Demostraremos que no son razones suficientes para invalidar el estatuto.

Hay una distinción que es necesario establecer entre los niveles elemental y secundario de enseñanza y aquél correspondiente a la educación universitaria. La disparidad esencial reside en la función que cumplen sustancialmente uno y otro nivel. Aunque toda labor pedagógica implica la presencia de unas constantes que apuntan hacia la formación del individuo, lo cierto es que esa etapa formativa se apuntala en los niveles inferiores del aprendizaje. La escuela primaria y la superior establecen los verdaderos fundamentos de la formación del niño. Conjuntamente con el núcleo familiar y demás manifestaciones del medio social, la enseñanza escolar en esas fases instauran los cimientos del carácter y la conducta que observará el niño en su etapa adulta.

La educación universitaria, sin que constituya un desvío absoluto de la función de los niveles anteriores, se proyecta en otras direcciones. El universitario es ya el adulto que,

partiendo de lo anterior, se encamina hacia la especialización. Su aprendizaje se efectúa en un ámbito de intercambio de ideas, de contradicciones, de examen a fondo del conocimiento con el propósito de desarrollar un sentido crítico. Se le ofrecen diversas perspectivas que deberá pesar en su búsqueda de la verdad.

*Esta distinción de fases a niveles académicos implica una distinción entre los maestros que dirigen el proceso de aprender. En las manos del educador de los niveles inferiores, el Estado deposita una responsabilidad altamente delicada. El riesgo involucrado es de naturaleza superior, por lo que se obliga a una selección muy cuidadosa de quién habrá de tener en sus manos tan seria encomienda.*

Del profesor universitario se espera primordialmente *otra misión*. Debe, ante todo, despertar en el alumno la conciencia de su propia participación en el acto de aprender. El universitario ha de desarrollar, con la ayuda del maestro, el convencimiento de que el aprendizaje es obra de la voluntad personal y del empeño particular del individuo. La universidad, por lo tanto, debe estar abierta a los aires de extramuros, al fluir incesante de ideas y opiniones que expongan al estudiante a ese mundo complejo y conflictivo del conocimiento. Ciudadano o extranjero, importa mayormente el profesor que sirva a ese oficio indispensable de avivar la conciencia del alumno y contribuir a su proyección responsable en el contorno social.(5)

---

(5) Sobre este particular resultan esclarecedoras las expresiones del debate legislativo siguientes:

"Sr. SUSONI: ¿La Universidad de Puerto Rico tiene ese requisito?

"Sra. RODRIGUEZ MUNDO: La Universidad de Puerto Rico es un organismo autónomo, que se rige por una ley especial aprobada por la Legislatura de Puerto Rico y le confiere discreción al cuerpo directivo para seleccionar el mejor personal docente dond[eq]uiera que lo encuentre, y es la Universidad de Puerto Rico la única institución que no tiene que regirse por estos requisitos de ciudadanía." Diario de Sesiones de la Asamblea Legislativa (Senado), pág. 804.

En cuanto al segundo aspecto hay que mencionar que existen unas particularidades que distinguen claramente la escuela pública de la privada. La primera responde a una necesidad con la que el Estado tiene que cumplir: la de educar al individuo. El Gobierno tiene como uno de sus compromisos fundamentales —dimanante de la propia Constitución— ofrecer a sus ciudadanos la oportunidad de educarse convenientemente para realizarse en el orden personal y cumplir con decoro con su función de convivencia social.

La escuela privada, aparte de cumplir con unas normas generales que exige el Estado, abona a la garantía de una educación peculiar conforme al gusto y posibilidades de un sector privativo de la sociedad. El Estado no puede intervenir con la enseñanza privada que atiende a la opción voluntaria de quienes se decidan por ella. Esa escuela privada va a responder en principio, más que a la política educativa del Estado, a una filosofía de carácter particular —pedagógica, religiosa, militar, etc.— que la define y la singulariza.

Una razón adicional, de orden constitucional, visualizada por el Senado justifica esta distinción.

> . . . [R]equerir la ciudadanía americana a los maestros de escuelas públicas es constitucionalmente válido, mientras que exigir lo mismo en el contexto de las escuelas privadas es muy diferente. La doctrina federal consistentemente ha expresado que las clasificaciones por razón de ciudadanía en los empleos de la industria privada, serán vistas como clasificaciones sospechosas y sujetas a escrutinio estricto por parte de los tribunales.
>
> El mantener en el referido Artículo 5 el requisito de la ciudadanía americana a los maestros de las escuelas privadas en Puerto Rico requerirá que los tribunales utilicen el escrutinio estricto en su análisis al enfrentarse en su día a una impugnación de la misma, sobre la base de que viola la igual protección de las leyes contenida en la Enmienda D[e]cimocuarta de la Constitución de los Estados Unidos de América. En tal caso, el estado deberá probar un interés apremiante a proteger y que la exigencia de la ciudadanía americana es el único medio

para proteger el mismo. XXXLX Diario de Sesiones de la Asamblea Legislativa (Senado) 4304 (1986).

Por su parte, la Cámara de Representantes se expresó de la manera siguiente:

Las escuelas privadas realizan una función vital en nuestra sociedad. En primer lugar, liberan al Estado de una parte sustancial de la responsabilidad de educar a toda la población. En segundo lugar, ofrecen opciones diversas que propician el valor de una sociedad pluralista. En este sentido las escuelas privadas ofrecen la alternativa de la educación religiosa, militar o en un idioma distinto al castellano. La imposición del requisito de ciudadanía para los maestros de escuelas religiosas limita el ámbito de selección para la promoción de los fines religiosos.

Estas opciones deben mantenerse abiertas y deben funcionar con amplio grado de autonomía. Exigir que los maestros que enseñan en estas instituciones sean ciudadanos americanos les impondría condiciones innecesarias que entorpecerían su capacidad para adelantar sus objetivos particulares.

Además, el Gobierno de Puerto Rico rechaza abiertamente el dirigismo educativo. Lo que se justifica en el sistema público porque se trata de las escuelas del Estado, no es própio en las escuelas privadas que, aunque tienen que responder a unas exigencias de calidad académica, existen precisamente para ofrecer alternativas a la educación pública. Informe, *supra*, pág. 2.

## IV

Nuestra Constitución garantiza la igual protección de las leyes. Art. II, Sec. 7, Const. E.L.A., *supra.* Este principio no exige un trato igual para todos los ciudadanos, pero prohíbe un trato desigual injustificado. A tal efecto, en *Zachry International v. Tribunal Superior,* 104 D.P.R. 267, 279 (1975), expresamos:

En virtud de sus diversas disposiciones y su aplicación a distintas áreas, *no pueden extenderse prohibiciones absolutas que impidan el ejercicio legítimo del poder de reglamenta-*

*ción del Estado para aprobar medidas razonables con el objetivo de salvaguardar el interés común.* Una pieza legislativa debe sostenerse o anularse en orden a la dimensión, sustancialidad y realidad de los principios comunitarios e individuales envueltos y los problemas sociales que intenta corregir. (Énfasis suplido.)

La opinión mayoritaria, pág. 484, evalúa la presente controversia a la luz del derecho constitucional puertorriqueño, y admite que "la Asamblea Constituyente no concibió el discrimen por razón de extranjería como uno de los expresamente prohibidos por el Art. II, Sec. 7 de nuestra Constitución, *supra*". Descarta asimismo que ésa fuera la intención al utilizar el término "'nacimiento'". Opinión mayoritaria, pág. 484. Sin embargo, al amparo del lenguaje usado en *León Rosario v. Torres*, 109 D.P.R. 804, 813 (1980), en *Wackenhut Corp. v. Rodríguez Aponte*, 100 D.P.R. 518, 531 (1972), y en *Zachry International v. Tribunal Superior*, supra —en que señalamos que las clasificaciones fundamentadas en "nacionalidad" eran inherentemente sospechosas y exigían "un riguroso análisis constitucional"— funde ambos conceptos. Por vía del esc. 3, sin apoyo en otra autoridad o ulterior análisis, concluye que "[a]unque para efectos del derecho internacional público los términos "'nacionalidad'" y "'ciudadanía'" no constituyen conceptos sinónimos, desde el punto de vista de la garantía constitucional representan idéntico valor". Opinión mayoritaria, pág. 485.

No podemos compartir ese análisis. Los términos "nacionalidad" y "ciudadanía", además de no ser sinónimos en diferentes campos del saber, tampoco representan un mismo valor en el Derecho puertorriqueño. Expliquémonos.

El tránsito de uno a otro ámbito del conocimiento humano nos enfrenta con distintas acepciones de estos vocablos que nos hacen suponer la existencia de un claro deslinde entre ambos. Pero la cuestión va más allá. Aun dentro de la disciplina del Derecho puede establecerse evidentemente dicha distinción.

En el Derecho estadounidense estos conceptos muchas veces se han empleado indistintamente.([6]) Así, por ejemplo, el *Black's Law Dictionary* no precisa escisión alguna entre ambas palabras. En primer lugar, define *nacionalidad* en su sentido amplio de "cualidad o carácter que surge del hecho de pertenecer una persona a una nación o a un estado". Luego especifica que "[l]a nacionalidad determina el *status* político del individuo, especialmente en lo que se refiere a su lealtad, mientras que *domicilio* se refiere a su *status* civil". La parte final de la definición precisa aún más la equivalencia de los vocablos: "La nacionalidad surge por nacimiento o por naturalización". (Traducción nuestra.) *Black's Law Dictionary*, 5ta ed., Minnesota, Ed. West Publishing Co., 1979, págs. 923–924. De hecho, el nombre abreviado del estatuto federal, *Immigration and Nationality Act*, 8 U.S.C. sec. 1101 *et seq.*, que rige los asuntos de inmigración, naturalización y admisión de extranjeros, es denominado *Nationality Act*.

---

([6]) Aunque se ha señalado que el término "nacional" como se usa en la frase "national of the United States" es más amplio que el término "citizen", *Brassert v. Biddle*, 59 F. Supp. 457, 462 (1944), la ley parece equipararlos. Esto se puede apreciar cuando habla del derecho a renunciar la nacionalidad. 8 U.S.C. sec. 1481(a)5.

"Se requiere renuncia formal ante un funcionario diplomático o consular de los Estados Unidos en un país extranjero. Un 'nacional' es un ciudadano de los Estados Unidos o una persona que le debe 'lealtad permanente' a esa nación. Véanse 8 U.S.C. sec. 1101 (22) y *Law-DonShew* v. *Dulles*, 217 F2d. 146 (1954)." Serrano Geyls, *op. cit.*, Vol. I, pág. 318.

Sin embargo, "es digno de atención que el término *'citizen'* se encuentra a lo largo de la Constitución de los Estados Unidos, mientras nunca se emplea *'national'*". (Traducción nuestra y énfasis suplido.) *Encyclopedia of the Social Sciences*, Nueva York, The MacMillan Co., 1962, pág. 249.

En los siguientes trabajos los términos *nacionalidad* y *ciudadanía* se utilizan indistintamente. B. Sánchez Rivera y F. Sánchez Del Toro, *El discrimen por razón de nacionalidad*, 35 Rev. C. Abo. P.R. 357 (1974); H. Silving, *Factors Which Determine Nationality*, XXVI Rev. Jur. U.P.R. 217 (1957).

En Puerto Rico el asunto toma un cariz diferente.(7) En nuestro uso los términos no son correspondientes. La palabra *nacionalidad* tiene para nosotros una amplia gradación de contenidos que sumados la dotan de un profundo y amplio sentido. Consiste en la amalgama de elementos como lo geográfico, lo étnico y lo cultural, todo ello impregnado de una particular expresión de identidad que tiene mucho que ver con el espíritu de un pueblo. "La nacionalidad es de naturaleza sico-sociológica. No se forma racionalmente, sino afectivamente. Es un sentimiento compartido por un grupo de personas; es una conciencia común, formada en virtud del contacto con unos elementos comunes a todos, y que a la vez determina una sensación de cohesión del grupo entre sí y de diferenciación frente a otros grupos." R. Garzaro, *Puerto Rico, una nación en busca de estado*, Salamanca, Ed. Tecnos, 1974, pág. 32. Véanse, además: M. García-Pelayo, *El Tema de las Nacionalidades*, Madrid, Ed. Pablo Iglesias, 1979; A. Sánchez Tarniella, *Colonialismo y desnacionalización: un enfoque analítico*, Bayamón, Ed. Bayoán, 1982.(8)

Contrario a la definición de *Black's Law Dictionary*, no basta con el mero nacimiento o con el acto de la naturalización. Ni lo uno ni lo otro parecen asegurar la pura y la genuina manifestación de la nacionalidad. Se requiere casi una indefinible condición que, como indicamos antes, es la suma de las muchas cosas que dan carácter, individualidad, personalidad a un pueblo frente a y en contraste con los demás pueblos del mundo.

---

(7) Véase A.L. García Martínez, *La ciudadanía puertorriqueña: concepto del habitante natural*, 39 Rev. C. Abo. P.R. 241 (1978).

(8) El *Diccionario de Ciencias Sociales*, Madrid, Instituto de Estudios Políticos, 1976, Vol. II, pág. 303, al definir el término "nacionalidad" nos remite al *Diccionario de la Lengua Española* de la Real Academia Española, el cual ofrece dos (2) acepciones: "(1) Condición y carácter peculiar de los pueblos e individuos de una nación; (2) Doctrina que exalta en todos los órdenes de la personalidad nacional completa, o lo que reputan como tal los partidarios de ella."

En *Marrero Reyes v. García Ramírez*, 105 D.P.R. 90 (1976), al examinar el Art. 9 de nuestro Código Civil, 31 L.P.R.A. sec. 9, adelantamos unos pronunciamientos relacionados con el asunto que hoy nos atañe. A principios del presente siglo[9] se pudo observar el esfuerzo para "soslayar el uso de términos que pudiesen dar base a argumentar la existencia de una nacionalidad puertorriqueña como tal". Añadimos que "[a] tono con las corrientes político-constitucionales que afectaban el clima de aquellos viejos tiempos, se estaba intentando claramente sustituir el concepto de la nacionalidad por la ciudadanía al modo territorial norteamericano". *Marrero Reyes v. García Ramírez*, supra, págs. 102–103.

*Ciudadanía* se vincula con lo oficial, con lo adquirido, eso sí, "por nacimiento o por naturalización", como algo otorgado o adquirido legalmente, como un documento que no implica por necesidad un sentimiento profundo e inconfundible que es como la segunda esencia de la persona humana.

En Puerto Rico decimos que alguien es de nacionalidad argentina, española o mejicana sin que al decirlo estemos en modo alguno informando cuál es la ciudadanía de que disfruta la persona cuya nacionalidad estamos señalando. Pudo haber obtenido hace años la ciudadanía de Estados Unidos, pero lo que realmente nos concierne o interesa es esa especial manera de ser, esa idiosincrasia, ese conjunto de cualidades que nos refieren de inmediato al concepto que resaltamos y nos importa: su nacionalidad.

Por todo lo dicho, es lógico suponer que precisamente esa acepción puertorriqueña del concepto "nacionalidad" fue la que quisimos incorporar en *Wackenhut Corp. v. Rodríguez Aponte*, supra, en *Zachry International v. Tribunal Supe-*

---

[9] Véase *Cruz v. Domínguez*, 8 D.P.R. 580 (1905).

*rior*, supra, y en *León Rosario v. Torres*, supra.[10] Entendido así, la opinión mayoritaria no puede descansar en ese concepto para apoyar su decreto de inconstitucionalidad, mucho menos cuando se trata de un *dictum* sin referente alguno. No debemos olvidar que en ninguno de los tres (3) casos anteriores se plantearon situaciones de discrimen por nacionalidad o por ciudadanía que pudieran iluminarnos al respecto. Y por ser una norma de naturaleza jurisprudencial —contrario a las normas constitucionales o estatutarias— no podemos referirnos a su historial para aclarar su significado.

Visto de esta manera, la demandante señora De Paz Lisk no atina en su alegato de discrimen por nacionalidad, porque la clasificación establecida por la Ley Núm. 94, *supra*, no se fundamenta en el concepto de nacionalidad sino en el de ciudadanía. En Puerto Rico, de acuerdo con lo estatuido, un dominicano puede desempeñarse como maestro del sistema de instrucción pública si cumple con los requisitos para ocupar ese cargo, entre los cuales se incluye el de la ciudadanía americana. A tenor con el esquema constitucional, la señora De Paz Lisk podría prevalecer sólo si demostrara que se dis-

---

[10] No debemos pasar por alto que la Carta de Derechos de nuestra Constitución se inspiró en la *Declaración Universal de Derechos del Hombre* aprobada y proclamada por la Asamblea General de las Naciones Unidas el 10 de diciembre de 1948. Véanse: 2 Diario de Sesiones de la Asamblea Constituyente 1382–1383 (1952); J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. III, pág. 174; *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954.

De hecho, el Art. II, Sec. 1 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, incorporó casi todos los elementos del Art. 2 de la *Declaración Universal*.

"Art. 2 - 1. Toda persona tiene todos los derechos y libertades proclamados en esta Declaración, sin distinción alguna de raza, color, sexo, idioma, religión, opinión política o de cualquier otra índole, *origen nacional* o social, posición económica, nacimiento o cualquier otra condición)." (Énfasis suplido.)

Entre las omisiones significativas cabe destacar la de la proscripción de distinciones por "origen nacional" o la prohibición de discriminar por la procedencia nacional del individuo. Véase *La Declaración Universal de Derechos Humanos (comentarios y texto)*, Costa Rica, Eds. Juricentro, 1979, págs. 23 y 211.

criminó contra ella debido a su nacionalidad dominicana. De igual modo, lo mismo un puertorriqueño que un estadounidense que haya perdido la ciudadanía americana —bien sea por haberla renunciado o adoptado otra— aunque resida en Puerto Rico, tampoco podría aquí ocupar una plaza de maestro en el sistema de instrucción pública.

La realidad expuesta nos obliga a disentir de la opinión mayoritaria. La Ley Núm. 94, *supra*, resiste el presente embate constitucional. El foro de instancia erró al sostener lo contrario. La mayoría de este Tribunal no debería refrendar ese dictamen.

—O—

Opinión disidente emitida por el Juez Asociado Señor Rebollo López.

El poder inherente que tiene el Estado de defender y preservar el sistema democrático de gobierno bajo el cual vivimos es innegable. A esos fines nuestra Asamblea Legislativa ha considerado conveniente, *en relación con el sistema de instrucción pública*, requerir que todo extranjero que aspire a educar a nuestros niños y a nuestra juventud —sobre los cuales recaerá en el mañana la obligación de defender este sistema de gobierno— haya previamente demostrado que cree en, y comparte, los principios democráticos de nuestro pueblo, adquiriendo la ciudadanía americana.

A este Tribunal *no* le corresponde juzgar la sabiduría o conveniencia de una ley aprobada por la Asamblea Legislativa de Puerto Rico; ello es de la competencia exclusiva del legislador. Sí le corresponde a este Foro juzgar y determinar la validez o constitucionalidad de las leyes. Al así hacerlo, sin embargo, debe limitarse a determinar esa validez a la luz de las disposiciones pertinentes tanto de la Constitución federal como de la nuestra, de la jurisprudencia interpretativa de las mismas y de los "criterios de análisis constitucional" según

éstos han sido definidos y aplicados tanto por el Tribunal Supremo de Estados Unidos como por este Tribunal.

Ha sido precisamente en reconocimiento de ese poder legítimo del Estado de defender y preservar su sistema democrático de gobierno que el Tribunal Supremo de Estados Unidos ha sostenido, a la luz de las disposiciones pertinentes de la Constitución federal, *la aplicabilidad del "escrutinio mínimo o de nexo racional"* al evaluar la constitucionalidad de leyes que excluyen a extranjeros de ciertas posiciones públicas —que denominan como de "función política"— *tales como policías, oficiales probatorios, jurados y maestros.*

Ello no obstante, una mayoría de los integrantes del Tribunal en el día de hoy inexplicablemente evalúa la disposición estatutaria en controversia bajo el "criterio del escrutinio estricto", erróneamente sosteniendo que no es de aplicación en el presente caso la llamada "excepción de función política". Como consecuencia de ello, se declara inconstitucional el requisito de ciudadanía americana requerido por la Ley Núm. 94 de 21 de junio de 1955 (18 L.P.R.A. sec. 264(1)).

Nuestro disenso en el presente caso no necesariamente significa que entendamos que la política pública adoptada por el Estado Libre Asociado de Puerto Rico en la referida Ley Núm. 94 —de exigir la ciudadanía americana como condición para ejercer el magisterio en las escuelas públicas del país— sea una acertada, sabia o deseable. Al igual que la inmensa mayoría de los puertorriqueños somos de la opinión, en nuestro carácter personal, que las personas provenientes de países hermanos deben tener derecho, luego de arribar a nuestras playas, a trabajar honradamente en nuestra tierra y a ganarse el sustento de ellos y de su familia en la profesión u oficio que deseen y estén capacitados para desempeñar.

Disentimos llana y sencillamente por cuanto, en el descargo responsable de nuestra función judicial, no tenemos duda alguna de que la correcta interpretación de la jurisprudencia aplicable sobre la materia en controversia hace man-

datoria la conclusión de que el Estado tiene la facultad constitucional para exigir el requisito de la ciudadanía americana en relación con el desempeño del cargo de maestro en el sistema de instrucción pública de nuestro país.

I

La Constitución del Estado Libre Asociado de Puerto Rico dispone, en su Art. II, Sec. 1, L.P.R.A., Tomo 1, ed. 1982, pág. 257, que:

> La dignidad del ser humano es inviolable. Todos los hombres son iguales ante la Ley. No podrá establecerse discrimen alguno por motivo de raza, color, sexo, *nacimiento*, origen o condición social, ni ideas políticas o religiosas. Tanto las leyes como el sistema de instrucción pública encarnarán estos principios de esencial igualdad humana. (Énfasis suplido.)

Si bien de una lectura de la citada disposición de la Constitución podría derivarse la impresión de que la misma prohíbe de manera expresa el discrimen por razón de extranjería —a base de que el concepto "nacimiento" incluye o contempla el mismo— ello no es así.

De los diálogos acaecidos durante la discusión de la antes mencionada disposición constitucional durante la Asamblea Constituyente surge claramente que la palabra "nacimiento" "se dirige *exclusivamente* a establecer la igualdad de los hijos en la vida civil". (Énfasis suplido.) 2 Diario de Sesiones de la Convención Constituyente 1374 (1952). "Se propon[ía] eliminar el estigma jurídico en contra de los hijos habidos fuera de[l] matrimonio". Informe de la Comisión de Carta de la Convención Constituyente de Puerto Rico, 4 Diario de Sesiones de la Convención Constituyente 2560, 2562 (1951).

Más aún, surge de estos diálogos que existía la preocupación entre algunos miembros de la Asamblea Constituyente de que fuera a interpretarse la palabra "nacimiento" como incluyendo las personas nacidas fuera de Puerto Rico o fuera de Estados Unidos. Se temía que dicha interpretación tu-

viera el efecto de hacer la referida disposición constitucional incompatible con legislación federal y que la misma se entendiera limitativa del poder del Estado para distinguir entre ciudadanos y no ciudadanos al conceder algunos privilegios.

A estos efectos expresó el delegado señor García Méndez:

> . . . La palabra ["nacimiento"] habla por sí misma y es de una extensión tal que incluye o puede incluir, incluye o incluir, repito, hasta las personas nacidas fuera de Puerto Rico o fuera del territorio continental de Estados Unidos de América *y si esa interpretación, que es muy posible, surgiera entonces, estaríamos redactando una carta de derechos contentiva de una disposición absolutamente incompatible con una enorme cantidad de legislación federal . . . que establec[e] diferenciaciones sustanciales entre los ciudadanos americanos y los ciudadanos extranjeros.* (Énfasis suplido.) Diario de Sesiones, *supra*, Vol. 2, pág. 1375.

Y señaló el señor González Blanes:

> Pero no creo yo que el Estado debe ser coartado en establecer cierta distinción a favor de sus ciudadanos y en contra de personas nacidas fuera de Puerto Rico. Porque lo vemos de continuo tanto en la legislación federal como aun en la legislación insular, que cabe establecer ciertos privilegios a favor de las personas nacidas en Puerto Rico y en contra de personas nacidas en otros sitios. Diario de Sesiones, *supra*, Vol. 2, pág. 1384.

De manera que no sólo *no* se concibió el discrimen por razón de extranjería como uno de los expresamente proscritos por el Art. II, Sec. 1 de nuestra Constitución, ante, sino que *no* fue la intención de la Asamblea Constituyente privar al Estado de su facultad de establecer cierta distinción a favor de sus ciudadanos y en contra de personas nacidas fuera de Puerto Rico.

## II

Conforme doctrina establecida desde el año de 1886 por el Tribunal Supremo de Estados Unidos, los extranjeros son "personas" para fines de la Enmienda Decimocuarta de la Constitución de Estados Unidos. En consecuencia, éstos están protegidos por la "cláusula de igual protección de las leyes" de la Constitución federal. Véase, a esos efectos, *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). No fue hasta 1971, sin embargo, que el Tribunal Supremo federal —en *Graham v. Richardson*, 403 U.S. 365 (1971)— resolvió que las "clasificaciones" basadas en extranjería son "inherentemente sospechosas" y, como tales, sujetas a un riguroso análisis judicial o "escrutinio estricto".[1] Es de notar que, siendo aplicables a Puerto Rico los derechos protegidos por las cláusulas del debido proceso de ley e igual protección de las leyes de la Constitución federal, los pronunciamientos del Tribunal Supremo de Estados Unidos en esta área del Derecho son obligatorios para este Tribunal. *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 668–669 (1974), *Examining Board v. Flores de Otero*, 426 U.S. 572, 599–601 (1976); *Posadas de Puerto Rico Assoc. v. Tourism Co.*, 478 U.S. 328 (1986).

Lo anteriormente expresado, sin embargo, *no* significa que en todo caso en que se cuestione la constitucionalidad de una ley por razón de que la misma alegadamente discrimina por razón de extranjería los tribunales estemos obligados a aplicar el criterio del "estricto escrutinio judicial". Ello es así por cuanto, con posterioridad al citado caso de *Graham v. Richardson*, ante, el Tribunal Supremo federal, *en reconocimiento del legítimo interés de los estados en reservar para los ciudadanos aquellas posiciones públicas relacionadas con el proceso de autogobierno*, estableció una excepción

---

[1] Como es sabido, para que una ley satisfactoriamente resista este escrutinio, la misma debe adelantar un "interés estatal apremiante" por conducto de los medios menos restrictivos posibles. *Bernal v. Fainter*, 467 U.S. 216, 219 (1984).

—conocida como "excepción de la función política"— a la norma general de estricta revisión judicial de clasificaciones basadas en extranjería.

Conforme dicha jurisprudencia, cuando un estatuto excluya a los extranjeros de una posición pública *que conlleva el ejercicio de una función gubernamental importante o que tiene un impacto sustancial sobre miembros de la comunidad*, se sostendrá su constitucionalidad si existe una *relación racional* entre el interés del Estado y la clasificación. Esto es, se aplicará *el "criterio mínimo o de nexo racional"* al evaluar su constitucionalidad. Véanse: *Sugarman v. Dougall*, 413 U.S. 634 (1972); *Perkins v. Smith*, 426 U.S. 913 (1976); *Foley v. Connelie*, 435 U.S. 291 (1978); *Ambach v. Norwick*, 441 U.S. 68 (1979); *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982); *Bernal v. Fainter*, 467 U.S. 216 (1984).

Un análisis de las antes mencionadas decisiones del Tribunal Supremo federal demuestra que mediante las mismas dicho Foro sostuvo la constitucionalidad de diversos estatutos aprobados por diferentes estados de la Unión Americana en que se exigía la ciudadanía americana como requisito para poder desempeñar ciertos y determinados cargos públicos, a saber: policías estatales (*Foley v. Connelie*, ante); jurados (*Perkins v. Smith*, ante); maestros (*Ambach v. Norwick*, ante), y ayudante de oficial probatorio (*Cabell v. Chavez-Salido*, ante). Véanse, en general: 2 *Treatise on Constitutional Law: Substance and Procedure* Sec. 18.12 (1986); L.H. Tribe, *American Constitutional Law*, 2da ed., Nueva York, Ed. Foundation Press, 1988, Sec. 16-23.

## III

Procede que analicemos brevemente dichas decisiones: En *Sugarman v. Dougall*, ante, el Tribunal Supremo federal, aplicando el criterio de "estricto escrutinio", declaró inconstitucional una ley del estado de Nueva York que establecía que solamente los ciudadanos americanos serían elegibles

para ocupar *cualquier posición* en el servicio por oposición estatal.(2) El estado alegó que la exclusión de los extranjeros respondía a su interés de emplear sólo aquellas personas que tuvieran completa lealtad hacia el Gobierno. El Tribunal entendió que, a la luz de dicho interés, *la prohibición era demasiado abarcadora*, ya que se extendía a *muchas posiciones* para cuyo efectivo desempeño la ciudadanía o lealtad era irrelevante.

Al así resolver, sin embargo, *el Tribunal Supremo federal hizo claro que no estaba resolviendo que un estado no puede requerir la ciudadanía americana para ocupar ciertas posiciones "adecuadamente definidas", pues si el requisito de ciudadanía guarda un "nexo racional" con las exigencias particulares de un cargo, el Estado podría válidamente requerir el mismo.* Manifestó el Tribunal:

> Aunque resolvemos que la Sec. 53 es inconstitucional, *no sostenemos que, a base de una determinación particular, a un extranjero no se le pueda negar empleo en o no pueda ser despedido del servicio público, aun a base del hecho de que éste no es ciudadano, si la negativa a reclutarlo o el despido descansan sobre un interés legítimo del Estado tocante a ciertos requisitos de un puesto en particular o a las características que debe tener el empleado.* Lo único que sostenemos es que una prohibición categórica a que se empleen extranjeros *en cargos que tienen muy poca o ninguna relación con los intereses legítimos del Estado,* no puede tolerarse un escrutinio bajo la Decimocuarta Enmienda.

---

(2) La Sec. 53(1) de la Ley del Servicio Civil de Nueva York en cuestión leía:
"'Except as herein otherwise provided, no person shall be eligible for appointment for any position in the *competitive class* unless he is a citizen of the United States.'" (Énfasis suplido.) *Sugarman v. Dougall,* 413 U.S. 634, 635 (1973).

Conforme a la Sec. 44, el "servicio competitivo" incluía:

". . . all positions for which it is practicable to determine merit and fitness by a competitive examination". *Sugarman v. Dougall,* ante, pág. 639.

Caían bajo dicha categoría tanto posiciones clericales como posiciones que conllevaban la formulación de política pública. Así por ejemplo incluía: mecanógrafos, conserjes, empleados de oficina, etc.

*Tampoco sostenemos que para cierta clase de puestos adecuadamente definidos un Estado no pueda requerir la ciudadanía como requisito para el mismo.* Tal y como "los padres de la Constitución pretendían que los Estados retuvieran para sí, según lo dispuesto por la Enmienda Décima, el poder de regular las elecciones", . . . "[c]*ada Estado tiene el poder de establecer los requisitos que deberán satisfacer sus funcionarios y la manera en que éstos han de ser seleccionados*". . . . Este es un *poder inherente* del Estado en la medida en que éste tiene la obligación, antes mencionada, "de preservar la concepción básica de una comunidad política". . . . Y este poder y esta responsabilidad del Estado aplica no sólo a los requisitos de los electores, sino también a aquellas personas que ocupan puestos electivos o puestos importantes no electivos en las Ramas Ejecutiva, Legislativa y Judicial, ya que los funcionarios que participan directamente en la formulación, ejecución y revisión de una amplia política pública realizan funciones que van a la médula de un gobierno representativo. Allí, según las palabras del Juez Lumbard, en su opinión concurrente, es "donde la ciudadanía guarda cierta relación racional con las exigencias especiales de un puesto en particular". 339 F. Supp., pág. 911.

. . . . . . . .

. . . *El escrutinio que utilizaremos no será tan severo cuando lidiemos con situaciones y materias que firmemente descansen dentro de las prerrogativas constitucionales de un Estado* . . . . Esto no es más que un reconocimiento del poder histórico de un Estado de excluir extranjeros de participar en sus instituciones políticas democráticas . . . y del reconocimiento de la responsabilidad constitucional de un Estado para el establecimiento y operación de su propio sistema de gobierno y para el establecimiento de las cualificaciones de una clase apropiadamente designada de servidores públicos". (Traducción nuestra y énfasis suplido.) *Sugarman v. Dougall*, ante, págs. 646–648.

Posteriormente, en *Perkins v. Smith*, ante, el Tribunal Supremo federal —al confirmar, *sin opinión*, una decisión del Tribunal de Distrito federal de Maryland en la que se sostuvo la constitucionalidad de una ley estatal que requería

la ciudadanía americana para servir como jurado— resolvió que un estado puede válidamente requerir la ciudadanía como condición para servir en esa capacidad.

La excepción a la norma de "estricto escrutinio judicial" de clasificaciones basadas en extranjería apuntada en *Sugarman v. Dougall*, ante, se concretó en *Foley v. Connelie*, ante. En el mismo, el Tribunal Supremo federal *aplicó el "criterio mínimo o de nexo racional"* y sostuvo la constitucionalidad de una ley que exigía que todo *miembro de la Policía estatal* fuese ciudadano americano. Señaló el Tribunal, entre otras cosas, que es "inapropiado el que se requiera que toda exclusión estatutaria de extranjeros sobrepase la alta valla del criterio del 'escrutinio estricto', por cuanto el así requerirlo eliminaría toda distinción entre los ciudadanos y los extranjeros, depreciándose de esa manera los valores históricos de la ciudadanía americana" (*Foley v. Connelie*, ante, pág. 295), y que a los fines de resolver si debía aplicarse el escrutinio estricto o de nexo racional era necesario *"examinar cada posición en cuestión para determinar si la misma envuelve el ejercicio de discreción en la toma de decisiones o la ejecución de política pública que afecte sustancialmente a los miembros de la comunidad"*. Íd., pág. 296. De ser así, el escrutinio a aplicarse sería el de nexo racional.

Observó entonces el Tribunal que la Policía desempeña una de las funciones básicas del Gobierno —está encargada de la prevención y detención del crimen, la aprehensión de criminales, investigación de conducta sospechosa y tiene el poder de arrestar— y que, al llevar a cabo estas funciones, *ejerce un alto grado de discreción* cuyo abuso o mal uso puede tener un serio impacto en las personas. Por ende, resolvió que el estado podía excluir a los extranjeros del ejercicio de estas funciones, pues es razonable presumir que los ciudadanos están más familiarizados e identificados con los valores norteamericanos.

*¿Desempeñan los maestros de escuela pública una función gubernamental de tal importancia que deba aplicárseles la aludida excepción de función política?*

Dicha interrogante fue contestada en la afirmativa por el Tribunal Supremo federal en el caso de *Ambach v. Norwick*, ante. En esta ocasión se impugnó la constitucionalidad de una ley del estado de Nueva York que disponía que solamente los ciudadanos americanos y aquellos extranjeros que hubieren declarado su intención de adquirir la ciudadanía americana podían enseñar en las escuelas públicas.[3]

El Tribunal consideró *el rol del maestro en la sociedad* y la importancia de la educación pública; *observó que la educación es hoy día una de las funciones más importantes del Gobierno*; que son los maestros quienes preparan a los jóvenes para que puedan participar como ciudadanos respon-

---

[3] La disposición en cuestión leía:

"'No person shall be employed or authorized to teach in the public schools of the state who is: . . . 3. Not a citizen. The provisions of this subdivision shall not apply, however, to an alien teacher now or hereafter employed, provided such teacher shall make due application to become a citizen and thereafter within the time prescribed by law shall become a citizen. . . .' N.Y. Educ. Law Sec. 3001(3) (McKinney 1970)." *Ambach v. Norwick*, 441 U.S. 68, 70 n. 1 (1979).

Otra disposición proveía para la expedición de certificados provisionales:

"*Citizenship.* A teacher who is not a citizen of the United States or who has not declared intention of becoming a citizen may be issued a provisional certificate providing such teacher has the appropiate educational qualifications as defined in the regulations and (1) possesses skills or competencies not readily available among teachers holding citizenship, or (2) is unable to declare intention of becoming a citizen for valid statutory reasons. *Ambach v. Norwick*, ante, pág. 70 n. 2.

De estas disposiciones se desprende que solamente se excluía de la posición de maestro a aquellos extranjeros, que siendo elegibles para adquirir la ciudadanía americana rehusaban hacerlo. Como dato curioso debemos señalar que esa es la situación de la aquí apelada Minerva De Paz Lisk. Del récord surge que ésta, a pesar de ser elegible para obtener la ciudadanía americana por cumplir con el período de residencia establecido por el Congreso no hizo gestión alguna dirigida a obtenerla. La demandante es residente legal en Puerto Rico desde 1978. Véase Opinión mayoritaria, pág. 475.

La Sec. 1427 del *Immigration and Nationality Act*, 8 U.S.C. sec. 1401 *et seq.*, requiere un período mínimo de cinco (5) años de residencia en Estados Unidos para poder adquirir la ciudadanía mediante proceso de naturalización.

sables en la vida política del país y son los que les inculcan los valores sociales y morales prevalecientes en el sistema democrático norteamericano. *En consecuencia concluyó que éstos desempeñan una función gubernamental significativa y aplicando el "criterio mínimo o de nexo racional" sostuvo la constitucionalidad de la ley allí en controversia.*

En *Cabell v. Chavez-Salido*, ante, se extendió la "excepción de función política" a *los oficiales probatorios* porque éstos al tener el poder de arrestar, de recomendar la concesión o revocación de la probatoria, así como la responsabilidad de supervisar al probando, llevan a cabo una *importante función gubernamental* al igual que los policías envueltos en el caso de *Foley v. Connelie*, ante. Se sostuvo por tanto, *bajo el criterio mínimo*, la constitucionalidad de la ley que exigía la ciudadanía americana para poder ocupar el cargo de oficial probatorio.(4)

Finalmente, tenemos que en *Bernal v. Fainter*, ante —caso en que el Tribunal Supremo federal declaró inconstitucional el requisito de ciudadanía americana en relación con el desempeño del cargo de notario público— dicho Tribunal, al exponer "el por qué o razón de ser" de lo resuelto en el citado caso de *Ambach v. Norwick*, ante, expresó, a la pág. 220, que:

> ... In *Ambach v. Norwick*, 441 U.S. 68 (1979), we held that a State may bar aliens who have not declared their intent to become citizens from teaching in the public schools *because teachers, like police, possess a high degree of responsibility and discretion in the fulfillment of a basic governmental obli-*

---

(4) Es de notar que la ley en cuestión requería que todos aquellos empleados considerados *peace officers* fueran ciudadanos americanos. *Los oficiales probatorios caían bajo dicha categoría, pero así también más de setenta posiciones públicas.* Así, por ejemplo, estaban comprendidas en dicha categoría las personas que trabajan *recolectando el peaje en las carreteras, los sepultureros, guardias forestales, inspectores de mobiliario, agentes de hipódromo, patólogos forenses, alguaciles, guardias de caza y pesca, mensajeros de la oficina del Tesoro Estatal e inspectores de la Junta de Examinadores Dentales.*

*gation.* They have direct, day-to-day contact with students, exercise unsupervised discretion over them, act as role models, *and influence their students about the government and the political process* .... (Énfasis suplido.)

Un análisis de las decisiones antes mencionadas nos lleva a la conclusión de que la "razón de ser" de la llamada "excepción de función política" reside en que, conforme el Tribunal Supremo de Estados Unidos, los estados de la Unión Americana tienen el derecho a establecer su "propia forma de gobierno". Concomitante con ese derecho, los estados pueden decidir quiénes participan en ese gobierno; esto es, pueden válidamente disponer o requerir, mediante estatuto al efecto, que únicamente aquellos que son ciudadanos podrán desempeñar los cargos públicos que *conllevan un alto grado de discreción y responsabilidad y el descargo de una importante función u obligación gubernamental.* Ante una situación de esta naturaleza el criterio apropiado a utilizarse por los tribunales al evaluar la constitucionalidad de dichos estatutos, lo es el criterio deferencial del "escrutinio mínimo". *Ese ha sido el razonamiento rector a través de todas las decisiones emitidas al respecto por el Tribunal Supremo federal.*

En la opinión mayoritaria que se emite en el presente caso, se trata de evadir la aplicación de lo antes reseñado, apuntándose que el estatuto del estado de Nueva York envuelto en *Ambach v. Norwick,* ante —a diferencia del estatuto en controversia en el caso ante nuestra consideración— no contenía una prohibición absoluta, pues permitía que se expidiera un certificado de maestro a aquellos extranjeros que declarasen su intención de hacerse ciudadanos americanos cuando fueren elegibles para ello.

Debemos señalar que si bien existe esa diferencia entre los dos (2) estatutos, *lo que consideró fundamental el Tribunal Supremo federal en Ambach v. Norwick,* ante, al determinar si debía o no aplicar la excepción de función política y,

522

por ende, el criterio de nexo racional, *lo fue la naturaleza de la función que desempeña el maestro en la sociedad norteamericana.* Como hemos visto, así lo entendió y expresó el propio Tribunal Supremo federal cinco (5) años más tarde en *Bernal v. Fainter,* ante.

La mejor prueba de ello, sin embargo, lo constituye el hecho de que en las restantes situaciones —en los casos de jurados, policías estatales, oficiales probatorios— los estatutos allí en controversia no contenían la disposición a la que hace referencia la opinión mayoritaria, *y, aún así, dichos estatutos fueron declarados constitucionalmente válidos por el Tribunal Supremo federal, por cuanto dicho Tribunal entendió que el desempeño de dichos cargos públicos conllevaba un alto grado de discreción y responsabilidad y el descargo de una importante función u obligación gubernamental, por lo que los estados podían válidamente exigir que fueran ciudadanos americanos los que desempeñaran los mismos.*

## IV

En Puerto Rico, al igual que en la jurisdicción norteamericana, la educación es una de las más importantes funciones del Gobierno. El reconocimiento expreso en nuestra Constitución, del derecho de toda persona a una educación, así como el mandato para el establecimiento de un sistema de instrucción pública donde la enseñanza es gratuita y la asistencia a la escuela obligatoria, demuestran la importancia que tiene la educación para nuestra sociedad.(5)

---

(5) El Art. II, Sec. 5 de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ed. 1982, pág. 271, dispone:

*"Toda persona tiene derecho a una educación que propenda al pleno desarrollo de su personalidad y al fortalecimiento del respeto de los derechos del hombre y de las libertades fundamentales. Habrá un sistema de instrucción pública el cual será libre y enteramente no sectario. La enseñanza será gratuita*

Nuestro sistema de educación tiene por objetivo no sólo impartir unos conocimientos al estudiante, sino fomentar "la práctica consciente y el aprecio del sistema democrático", así como promover los valores culturales del pueblo puertorriqueño.(6) "La escuela es la institución social que contribuye al mejoramiento progresivo de la sociedad y a la conservación y enriquecimiento de aquellas normas de vida que la sociedad sanciona . . . ."(7)

Es la escuela la que prepara a los niños y jóvenes para la vida democrática y para que puedan participar como ciudadanos responsables en los asuntos políticos de nuestro pueblo. Dentro de este sistema el maestro ocupa un rol esencial. ". . . [A]tiende al desarrollo integral del individuo para que adquiera un concepto adecuado del mundo natural, de la organización social y del orden axiológico en que ha de desen-

---

*en la escuela primaria y secundaria y, hasta donde las facilidades del Estado lo permitan, se hará obligatoria para la escuela primaria.* La asistencia obligatoria a las escuelas primarias, hasta donde las facilidades del Estado lo permitan, según se dispone en la presente, no se interpretará como aplicable a aquellos que reciban instrucción primaria en escuelas establecidas bajo auspicios no gubernamentales. No se utilizará propiedad ni fondos públicos para el sostenimiento de escuelas o instituciones educativas que no sean las del Estado. Nada de lo contenido en esta disposición impedirá que el Estado pueda prestar a cualquier niño servicios no educativos establecidos por ley para protección o bienestar de la niñez." (Énfasis suplido.)

(6) Informe Final de la Comisión sobre Reforma Educativa establecida para cumplir con el mandato de la Ley Núm. 17 de agosto de 1974, según enmendada. Véase, además, Mensaje sobre el Estado del País del Honorable Gobernador de Puerto Rico Rafael Hernández Colón de 9 de febrero de 1987, donde se señala lo siguiente, en relación al sistema de educación pública:

"La escuela tiene que promover en nuestros estudiantes los valores éticos fundamentales de nuestra sociedad, la reverencia por la vida, la responsabilidad individual, la disciplina, la lealtad y la honestidad, el valor del trabajo, la ética cristiana, la convivencia y la tolerancia. En fin, la escuela debe estimular la reflexión profunda sobre los valores, individuales y colectivos, determinantes de la vida del puertorriqueño."

(7) Informe de la División de Investigaciones Pedagógicas del Consejo Superior de Enseñanza a la Comisión de Instrucción de la Cámara de Representantes de Puerto Rico, 1961, pág. 4.

volverse".(8) *Es la persona encargada de instrumentar los objetivos más amplios del sistema de educación y tiene por ende la responsabilidad de transmitir nuestros valores sociales y morales a los estudiantes.*

El maestro mantiene contacto directo día tras día con el estudiante y es la figura de autoridad más próxima a éste después de los padres. Es por ello que mediante su comportamiento y expresiones tiene la capacidad de influir de manera significativa sobre las actitudes y forma de pensar de sus estudiantes.

Aun cuando el maestro debe ceñirse a enseñar las asignaturas prescritas en el programa de estudios,(9) *tiene necesariamente amplia discreción en cuanto a la forma de presentar el material,* lo cual le permite transmitir sus ideas y creencias a los alumnos. En relación con la influencia que tiene un maestro sobre sus estudiantes, expresó el Tribunal Supremo federal en *Ambach v. Norwick,* ante, págs. 78–79:

> Within the public school system, teachers play a critical part in developing students' attitude toward government and understanding of the role of citizens in our society. Alone among employees of the system, teachers are in direct, day-to-day contact with students both in the classrooms and in the other varied activities of a modern school. In shaping the students' experience to achieve educational goals, teachers by necessity have wide discretion over the way the course material is communicated to students. They are responsible for presenting and explaining the subject matter in a way that is both comprehensible and inspiring. No amount of standardization of teaching materials or lesson plans can eliminate the

(8) Íd.

(9) 18 L.P.R.A. sec. 247 dispone:

"Los maestros darán instrucciones a los alumnos de las escuelas públicas en todas las asignaturas prescritas en el curso de estudios de acuerdo con los distintos grados y con las disposiciones de las leyes escolares. Durante las horas dedicadas a la enseñanza pública no se enseñará ninguna asignatura que no esté autorizada en dicho curso de estudio."

personal qualities a teacher brings to bear in achieving these goals. *Further, a teacher serves as a role model for his students, exerting a subtle but important influence over their perceptions and values. Thus, through both the presentation of course materials and the example he sets, a teacher has an opportunity to influence the attitudes of students toward government, the political process, and a citizen's social responsibilities. This influence is crucial to the continued good health of a democracy.* (Énfasis suplido.)

No habiendo nuestra Constitución proscrito expresamente el discrimen por razón de extranjería, *nada impide que apliquemos el criterio deferencial del "nexo racional" en este caso, siguiendo la jurisprudencia establecida a esos efectos por el Tribunal Supremo federal.* De hecho, su aplicación es lo más acorde con la intención de la Convención Constituyente de no privar al Estado de su facultad de "establecer cierta distinción a favor de sus ciudadanos y en contra de personas nacidas fuera de Puerto Rico". Diario de Sesiones, ante, Vol. 2, pág. 1384.

*Si en alguna situación se justifica distinguir entre ciudadanos y no ciudadanos es en relación con las personas que van a desempeñar la delicada función de educar a nuestros niños y jóvenes para participar en la vida democrática de nuestro pueblo.* Atendida *la naturaleza* de la función del maestro en nuestra sociedad *resulta claramente aplicable en este caso la "excepción de función política"* y, por ende, debemos evaluar la constitucionalidad del requisito de ciudadanía que establece la Ley Núm. 94, ante, para enseñar en las escuelas públicas bajo el criterio deferencial de "nexo racional", y no el "escrutinio estricto" que aplica la mayoría del Tribunal.

## V

Réstanos determinar si existe un nexo racional entre el requisito de ciudadanía y el interés legítimo del Estado en

asegurarse que las personas que ejerzan el magisterio en las escuelas públicas estén identificadas con nuestros valores y los principios de nuestro sistema democrático.

La ciudadanía es un estado y relación continua con una sociedad; significa algo más importante que la mera presencia física o residencia en un país.[10] *Implica una adhesión a nuestros valores y un compromiso solemne con los postulados de nuestro sistema constitucional democrático.* De ahí que pueda esperarse que los ciudadanos, a diferencia de los extranjeros que mantienen un vínculo de fidelidad con su país de origen, estén plenamente identificados con los valores fundamentales de nuestra sociedad y familiarizados con nuestras instituciones sociales y políticas.

El procedimiento de naturalización al cual deben someterse los extranjeros que deseen adquirir la ciudadanía no es un "mero ritual" sin significado alguno. *Mediante el mismo los extranjeros demuestran no sólo un entendimiento básico de nuestras instituciones, sistema de gobierno e historia, sino más importante aún, su adhesión a los principios constitucionales y valores imperantes en nuestro sistema político.*[11]

---

[10] *Sugarman v. Dougall*, ante, pág. 652, opinión disidente del Juez Rehnquist.

[11] Solamente son elegibles para ser naturalizados aquellos que satisfagan los siguientes requisitos:

(a) Hayan residido por lo menos cinco (5) años en Estados Unidos inmediatamente antes de radicar su petición de naturalización, posean buen carácter moral y lealtad hacia los principios de la Constitución de Estados Unidos.

(b) Demuestren su entendimiento del inglés.

(c) Demuestren un conocimiento y entendimiento básico de la historia, principios y forma de gobierno de Estados Unidos.

Véanse las Secs. 1423 y 1427 del *Immigration and Nationality Act*, ante.

En *Perkins v. Smith*, 370 F. Supp. 134, 141 (D.M. 1974), confirmado, sin opinión, por el Tribunal Supremo federal en 426 U.S. 913 (1976), se señala lo siguiente en la opinión concurrente del Juez Winter:

"Native-born citizens can be expected to be familiar with the social and political institutions of our society; with the society and political mores that affect

Es evidente, por tanto, que existe un "nexo racional" entre el requisito de ciudadanía americana y el interés del Gobierno de Puerto Rico en que las personas que enseñen en las escuelas públicas estén identificadas con los valores y principios democráticos fundamentales de nuestra sociedad.

Por otro lado no creemos, a la luz del interés del Estado, que sea demasiado oneroso requerir que las personas que interesen enseñar en las escuelas públicas hayan previamente demostrado su lealtad a los principios de nuestra sociedad adoptando la ciudadanía americana. No hay otros mecanismos adecuados para determinar si la persona está comprometida con los valores de la sociedad puertorriqueña. Contrario al conocimiento de un lenguaje o materia, la fidelidad a los valores y principios de nuestro sistema no es susceptible de ser medida por un examen.[12]

El hecho de que se exija la ciudadanía americana para enseñar en las escuelas públicas y no se requiera para ejercer el magisterio en las escuelas privadas no desvirtúa la posición del Estado. *El requisito de ciudadanía sólo se puede exigir a los maestros de escuela pública porque éstos actúan como un instrumento del Estado.* Esa es la razón de ser de la llamada "excepción de función política".

---

how we react and interact with other citizens. Naturalized citizens have also demonstrated their willingness to adjust to our patterns of living and attitudes, and have demonstrated a basic understanding of our institutions, system of government, history, and traditions. It is not irrational to assume that aliens as a class are not familiar with how we as individuals treat others and how we expect 'government' to treat us."

[12] En las págs. 489–490 de la opinión del Tribunal se señala que el Departamento de Instrucción Pública cuenta con suficientes mecanismos de supervisión y comprobación para asegurarse de que un candidato está en condiciones de comunicar los valores de esta sociedad sin tener que recurrir a una norma de preterición automática. ¿Qué mecanismos son ésos? Se señala, además, que el Secretario de Instrucción Pública puede establecer normas adicionales de preparación académica y profesionales. ¿Es que acaso de esa forma se puede comprobar que la persona está identificada con nuestros valores?

El "trato desigual" se justifica, además, porque el estudiante de escuela privada, a diferencia del de escuela pública, puede escoger libremente la escuela a la cual desea asistir. Los padres del primero, quienes por lo general son personas de recursos, pueden darse el lujo de cambiar a ese estudiante a otra escuela privada donde los miembros de la facultad de la misma sean más de su agrado. El estudiante de escuela pública, por el contrario, está obligado a asistir a la escuela que quede en su "zona de residencia", conforme la reglamentación del Departamento de Instrucción Pública.(13) Siendo el Estado el que determina la escuela pública a la cual deberá asistir el estudiante, tiene éste la obligación de proveer unas garantías aún mayores de que los maestros en dichas escuelas pueden comunicar adecuadamente nuestros valores democráticos.

---

(13) 18 L.P.R.A. sec. 80 dispone, en lo pertinente:

"(c) Los niños de ocho (8) a catorce (14) años de edad se inscribirán en cualquier escuela que estuviere situada a una distancia razonable de sus casas, y su asistencia a dicha escuela será obligatoria . . .".

El Reglamento para las Escuelas Elementales y Secundarias del Sistema de Instrucción Pública de Puerto Rico dispone, en relación a la admisión de estudiantes, lo siguiente:

*"La admisión de estudiantes se hará por áreas de asistencia basadas en la zona de residencia del estudiante, la población a servirse por cada plantel y las facilidades físicas, de personal y de transportación existentes.*

"Para las escuelas libres de música, vocacionales técnicas o de altas destrezas, superiores de área y otras escuelas que sirvan a más de un distrito escolar, el área de asistencia será fijada por el director de la región educativa correspondiente.

"Para las escuelas que sirvan un solo distrito escolar, o una parte de éste, dicha área de asistencia será fijada por el superintendente de escuelas.

"Cuando surjan situaciones de congestión o de escasez de matrícula en determinados planteles, por movimiento de población o por cambios en la zonificación, el director regional o el superintendente de escuelas, según sea el caso, hará los ajustes necesarios en las áreas de asistencia previamente fijadas para resolver las mismas.

"Cualquier excepción a estas normas será considerada por sus méritos por el director regional o el superintendente de escuelas, según sea el caso." (Énfasis suplido.)

## VI

En resumen, la decisión que hoy emite una mayoría de los integrantes del Tribunal constituye una intromisión indebida por parte de la Rama Judicial con el poder y función del Estado de velar por, y garantizar, el bienestar general de nuestro país y el de sus ciudadanos, amantes de la democracia, que en el mismo conviven. La misma no sólo es errónea en derecho sino que innecesariamente pone en peligro el futuro de nuestro sistema democrático de gobierno.

Es por ello que disentimos.